133 T.C. No. 15

UNITED STATES TAX COURT

ESTATE OF SAMUEL P. BLACK, JR., DECEASED, SAMUEL P. BLACK, III,
EXECUTOR, ET AL.,[1] Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 23188-05, 23191-05,  Filed December 14, 2009.
23516-06.

From 1927 until 1993, Mr. B was an employee,
officer, or director of E (an insurance company) and
was a major contributor to E's success.  In 1993, he,
his son, P, and trusts for P's two sons contributed
their unencumbered E stock to BLP, a family limited
partnership, in exchange for partnership interests
proportionate to the fair market value of the E stock
each contributed.  Mr. B's advisers had explained the
estate tax advantages of placing his E stock in BLP,
but the transaction was initiated to implement Mr. B's
buy-and-hold philosophy with respect to the family's E
stock.  Specifically, that transaction was a solution
to his concerns that (1) P's wife and her parents (she
in connection with a possible divorce from P, they
because of their continual financial problems) would
require P to sell or pledge some of his E stock to

[1]The following cases are consolidated herewith for trial,
briefing, and opinion:  Estate of Irene M. Black, Deceased,
Samuel P. Black, III, Executor, docket Nos. 23191-05 and 23516-
06.

satisfy their monetary needs (P previously had pledged 125,000 E shares as collateral for a loan), and (2) his grandsons would sell all or some of the E stock that they would receive upon the termination of their trusts. In 1993, P and the two trusts owned approximately $12 million (of the B family's approximately $80 million) worth of E stock.

Mr. B's estate plan established a pecuniary marital trust for Mrs. B and a $20 million bequest to a university endowment. Mr. B died in December 2001, and Mrs. B, 5 months later, before there was time to fund the marital trust, which P, as executor of both estates, had intended to fund with a portion of Mr. B's estate's interest in BLP. On Mrs. B's estate's Federal estate tax return, P deemed the marital trust to be funded as of the date of her death.

Because Mrs. B's estate lacked sufficient liquid assets to discharge its tax and other liabilities, P, BLP's managing partner, and E agreed to have BLP sell some of its E stock in a secondary offering. That sale raised $98 million, of which E lent to Mrs. B's estate $71 million. The interest on the loan was payable in a lump sum on the purported due date, more than 4 years from the date of the loan, and was deducted in full on Mrs. B's estate's tax return under sec. 20.2053-1(b)(3), Estate Tax Regs. Mrs. B's estate used the funds to discharge its Federal and State tax liabilities, pay the $20 million bequest to the university endowment, reimburse E's costs, totaling $980,625, in connection with the secondary offering, and pay $1,155,000 each to P, as executor fees, and to a law firm, as legal fees.

R determined that (1) the value of the E stock apportionable to Mr. B's partnership interest in BLP at his death is includable in his gross estate under either sec. 2035(a) or 2036(a)(1) or (2), I.R.C., (2) the marital deduction to which Mr. B's estate is entitled under sec. 2056, I.R.C., is limited to the value of the partnership interest in BLP that actually passed to the marital trust, (3) the deemed funding date of the marital trust and, hence, the size of the BLP interest includable in Mrs. B's estate under sec. 2044, I.R.C., is determined by reference to the value of BLP on the date of Mr. B's death, not on the date of Mrs. B's death when the value of BLP was higher and it would require a smaller interest in BLP to fund the trust, (4) the interest payable on the BLP loan to Mrs. B's estate is not a deductible administration expense under sec. 2053(a)(2), I.R.C., and (5) Mrs. B's estate is not entitled to deduct the $980,625 reimbursement of E's secondary

offering costs and is entitled to deduct only $500,000 of P's executor fee and $500,000 of the legal fees.

1. <u>Held</u>: Because Mr. B's transfer of E stock to BLP in exchange for a partnership interest therein constituted "a bona fide sale for an adequate and full consideration in money or money's worth" within the meaning of sec. 2036(a), I.R.C., the value of Mr. B's gross estate does not include the value of the transferred E stock apportionable to his date-of-death interest in BLP.

2. <u>Held</u>, <u>further</u>, holding No. 1 renders R's second determination moot.

3. <u>Held</u>, <u>further</u>, the deemed funding date of the marital trust is the date of Mrs. B's death.

4. <u>Held</u>, <u>further</u>, the loan from BLP to Mrs. B's estate was not "necessarily incurred" within the meaning of sec. 20.2053-3(a), Estate Tax Regs., and, therefore, the interest thereon is not a deductible administration expense under sec. 2053(a)(2), I.R.C.

5. <u>Held</u>, <u>further</u>, Mrs. B's estate is entitled to deduct $481,000 of its reimbursement of E's secondary offering costs, $577,500 for P's executor fee, and $577,500 for legal fees because only those amounts correspond to expenditures or effort on behalf of Mrs. B's estate.

<u>John W. Porter</u>, <u>J. Graham Kenney</u>, <u>Stephanie Loomis-Price</u>, and <u>Jason S. Zarin</u>, for petitioner.

<u>Gerald A. Thorpe</u> and <u>Andrew M. Stroot</u>, for respondent.

HALPERN, <u>Judge</u>: Respondent has issued four notices of deficiency (the notices) to Samuel P. Black III (petitioner). Two were issued to him in his capacity as executor of the estate of Samuel P. Black, Jr. (Mr. Black's estate and Mr. Black, respectively), and two were issued to him in his capacity as executor of the estate of Irene M. Black (Mrs. Black's estate and Mrs. Black, respectively). Two notices were with respect to

Federal gift tax (one with respect to Mr. Black and one with respect to Mrs. Black), each determining a deficiency in tax of $147,623 for 2001 for gifts by Mr. Black that were treated for Federal gift tax purposes as made one-half by each spouse. The other two notices were with respect to Federal estate tax, one determining a deficiency in tax of $129,166,964 for Mr. Black's estate, and the other determining a deficiency in tax of $82,224,024 for Mrs. Black's estate. Petitioner is the son of Mr. and Mrs. Black.

After concessions (all of which relate to valuation issues and issues resolved by the settlement of the valuation issues) the issues for decision are (1) whether the fair market value of stock that Mr. Black contributed to the Black Interests Limited Partnership (Black LP) is includable in his gross estate pursuant to section 2036[2] (the section 2036 issue); (2) if we decide that the fair market value of the stock Mr. Black contributed to Black LP, rather than the fair market value of Mr. Black's interest in Black LP, is includable in his gross estate under section 2036, whether the marital deduction to which Mr. Black's estate is entitled under section 2056 should be computed according to the value of the partnership interest that actually passed to Mrs. Black or according to the value of the underlying stock apportionable to that interest (the marital deduction issue); (3)

_____

[2]Unless otherwise stated, all section references are to the Internal Revenue Code as amended and in effect for the dates of decedents' deaths, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all dollar amounts to the nearest dollar.

for purposes of determining the value of the marital trust property includable in Mrs. Black's gross estate under section 2044, whether the marital trust that Mr. Black established for Mrs. Black's benefit should be deemed funded on the date of his death or on the date of her death (the date of funding issue); (4) whether Mrs. Black's estate may deduct, as an administrative expense under section 2053(a)(2), $20,296,274 in interest on an alleged loan from Black LP (the interest deductibility issue); (5) whether Mrs. Black's estate may deduct, as administrative expenses under section 2053, the following fees or expense reimbursements: (a) a $1,150,000 fee paid to petitioner for services as the executor of Mrs. Black's estate and trustee of the marital trust, (b) a $1,150,000 fee paid to the law firm of MacDonald, Illig, Jones & Britton LLP (MacDonald Illig), and (c) $980,625 paid to Black LP as reimbursement for expenses incurred in connection with a secondary offering of stock Black LP held (together, the fee deductibility issues); (6) whether under section 7491(a) respondent bears the burden of proof with respect to all factual issues (the burden of proof issue).  The notices also contain certain other adjustments that are purely computational.  Their resolution depends on our resolution of the issues in dispute.

## FINDINGS OF FACT

Some facts are stipulated and are so found.  The stipulation of facts, with accompanying exhibits, is incorporated herein by this reference.

At the time the petitions were filed, petitioner resided in Pennsylvania.

## The Black Family

Mr. Black was born on April 2, 1902, and died, at the age of 99, on December 12, 2001. Mrs. Black was born on December 18, 1906, and died shortly after Mr. Black, on May 25, 2002. Mr. and Mrs. Black were married in 1932 and remained married until Mr. Black's death. The Blacks were survived by their son (petitioner) and grandsons (petitioner's children), Samuel P. Black IV (Samuel), and Christopher Black (Christopher), who were 33 and 31 years old, respectively, when Mrs. Black died.

## Mr. Black's History With Erie Indemnity Company

Mr. Black was born into poverty in Mercer County, Pennsylvania. At age 11, he was selling bread on the street corner and peddling newspapers door-to-door. At age 19, he began work as an insurance adjuster at the Philadelphia Indemnity Exchange, where he worked with H.O. Hirt and O.G. Crawford.

In 1925, H.O. Hirt and O.G. Crawford founded Erie Indemnity Co. (Erie) and, in 1927, hired Mr. Black as Erie's first full-time claims manager. In 1925, Erie was a Pennsylvania automobile insurance company; by the early 1990s, Erie had become a multiline insurance company offering auto, home, commercial, and life insurance in 11 States and the District of Columbia through a network of independent insurance agents. Erie also managed the Erie Insurance Exchange, a reciprocal insurer.

Mr. Black was a large part of Erie's success.  Upon joining Erie, Mr. Black installed an extension of the "home office" telephone in his room at the YMCA across the street from Erie's office, making Erie one of the first insurance companies to offer around-the-clock claims service.  Mr. Black established Erie's underwriting department, where he drafted policies and endorsements and filed documents to conform to State and Federal laws.  Mr. Black also recruited agents and managed sales territories for Erie.

In 1930, Mr. Black became a member of the board of directors of Erie.  In 1962, when he was 60 years old, Mr. Black retired from his position as senior vice president.  After his retirement from Erie, Mr. Black continued to serve on Erie's board of directors.  In 1997, when he retired from the board of directors (at the age of 95), Mr. Black had not missed a single board meeting in 67 years.  According to William F. Hirt, son of founder H.O. Hirt, Mr. Black was "a major, major contributor to the success of Erie."  In 1997, petitioner was elected to succeed Mr. Black as a member of Erie's board of directors.

Through the years, Mr. Black acquired in Erie both class B voting stock and class A nonvoting stock.  Mr. Black was very bullish about the growth prospects for Erie stock, and he bought it at every opportunity.  By the 1960s, Mr. Black had become the second largest Erie shareholder.  Mr. Black was a conservative investor who subscribed to the "buy and hold" investment philosophy, particularly with regard to Erie stock.

Upon his retirement from Erie, Mr. Black received permission from Erie to form his own insurance agency, Samuel P. Black & Associates, Inc., which became one of Erie's independent insurance agents. Although by 1992 petitioner had taken over management of Samuel P. Black & Associates, Inc., Mr. Black was actively involved in its operation until shortly before his death in 2001.

Mr. Black's Gifts of Erie Stock

On October 6, 1988, Mr. Black, as settlor, and petitioner, as trustee, created two trusts, one for each of Mr. Black's grandsons, Samuel and Christopher (together, the grandson trusts). Each grandson trust was funded with 10 shares of Erie class A nonvoting stock.

In October 1988, December 1989, and December 1990, Mr. Black gave 600 shares, 1,120 shares, and 804 shares, respectively, of Erie class A nonvoting stock to petitioner. Also, in December 1989, December 1990, December 1992, and January 1993, Mr. Black gave a total of 2,829 shares of Erie class A nonvoting stock, through petitioner, to each of the grandson trusts.

Before 1988, Mr. Black had made other gifts of both Erie class A nonvoting stock and Erie class B voting stock to petitioner. Before 1993, petitioner had acquired Erie stock only by gift from Mr. Black or through stock splits.

As of October 11, 1993, Mr. Black owned 2,425,752 shares of Erie class A nonvoting stock and 400 shares of Erie class B voting stock.

Formation of Black Interests Limited Partnership

Between 1988 and 1993, when Mr. Black transferred Erie stock to petitioner and created trusts that held Erie stock for his grandsons, the stock split several times and substantially increased in value. Mr. Black became concerned that his grandsons (each of whom would be able to withdraw the trust principal, one-half at age 25 and the balance at age 30, at which point the grandson trusts would terminate) and petitioner would either need to or want to sell some or all of their Erie stock. His concern increased as the value of that stock increased.

Mr. Black's fear that petitioner might dispose of some or all of his Erie stock arose out of his concern (1) that petitioner might default on a personal loan from PNC Bank for which he had previously pledged 125,000 Erie shares as collateral, and that he might need to satisfy his obligation with that pledged stock, (2) over the status of petitioner's marriage to Karen Black, to whom he had been married since 1965, which Mr. Black thought would not last much longer and which, if it ended in divorce (as it did in 2004), might result in the transfer of some of petitioner's Erie stock to her,[3] and (3) about Karen Black's father's business and personal bankruptcies, which resulted in her parents' continuing need to obtain money from her and petitioner, a need that could conceivably require the sale of some of petitioner's Erie stock.

_____

[3]Karen Black did, in fact, receive the 125,000 pledged Erie shares in the divorce, by which time that stock had been released from its pledge to PNC Bank.

Mr. Black's fear that his grandsons might dispose of some or all of the Erie stock that they would receive upon termination of their trusts arose out of his concern (1) that, as of 1993, although both Samuel and Christopher were over 20 years old, neither held a job or was even looking for one, (2) that, in Mr. Black's view, both grandsons were too close to their mother, whom Mr. Black considered to be lazy, and (3) that they were both inexperienced financially and, therefore, might fall prey to people anxious to have them invest their money.

Mr. Black was also concerned about a brewing split between the two children of H.O. Hirt, William F. Hirt (Mr. Hirt) and Susan Hirt Hagen (Ms. Hagen), each of whom was a trustee of one of two trusts (created by H.O. Hirt) that, as of October 12, 1993, controlled 76.2 percent of Erie's voting stock. The two trusts shared a common institutional cotrustee. Under the terms of the trusts, the voting stock both trusts held was to be voted as a unit as directed by a majority of the three trustees.

In 1990, Ms. Hagen's husband, Thomas B. Hagen (Mr. Hagen), became Erie's chief executive officer. By 1993, however, an inappropriate relationship between Mr. Hagen and another senior officer was disrupting business decisions and causing valuable employees to resign. Ultimately, at a board meeting in September 1993, a majority of Erie's directors voted to terminate Mr. Hagen's employment. Mr. Black disapproved of Mr. Hagen's conduct and of his management of Erie, and he approved of Mr. Hagen's dismissal. He foresaw the possibility that the growing

antagonism between Mr. Hirt and Ms. Hagen might result in a split of the H.O. Hirt trusts and that the Black family stock, which, by 1993, represented 13 to 14 percent of the total voting and nonvoting Erie stock, might represent the swing vote in favor of the Hirt camp against the Hagen camp. That was another reason he wanted to consolidate and retain the family's Erie stock.

Mr. Black's gifts of Erie stock to petitioner and to the trusts for his grandsons were in some measure influenced by two of his regular advisers: James D. Cullen (Mr. Cullen) of MacDonald Illig, Mr. Black's business and estate planning lawyer; and Robert L. Wagner (Mr. Wagner), a certified public accountant with Ernst & Young (E&Y), Mr. Black's tax and financial adviser. Beginning in 1988, Messrs. Cullen and Wagner regularly met with Mr. Black and advised him to take advantage of his lifetime gift tax exclusion by making gifts of Erie stock to family members which, as described supra, he did. By the early 1990s, however, Mr. Black was expressing to those two advisers his concerns over the potential disposal of Erie stock by his grandsons and petitioner. During a meeting with Messrs. Cullen and Wagner, the latter offered to consult with one of his partners, Andy Painter (Mr. Painter). In August 1992, Mr. Painter gave Mr. Wagner a memorandum suggesting--and later himself met with Mr. Black to suggest--a number of alternative, essentially tax planning, vehicles for Mr. Black to consider, including a family limited partnership, grantor retained interest trusts, and, to satisfy Mr. Black's desires with respect to charitable giving, an income

or remainder charitable trust, or private foundation. Mr. Painter's memorandum refers to an article written by Stacy Eastland (Mr. Eastland), at that time an attorney with the law firm of Baker & Botts LLP, who specialized in estate planning. Mr. Cullen spoke with Mr. Black about the article, which outlines a number of nontax reasons for forming a family limited partnership, including keeping family assets in the family, reducing costs by consolidating family assets, protecting family assets from future creditors, and protecting family assets from divorce proceedings.

Ultimately, Mr. Black's advisers recommended the formation of a family limited partnership to satisfy his goals of (1) consolidating and protecting the family's Erie stock and (2) minimizing the estate taxes that would be payable upon his death and Mrs. Black's death. Mr. Black followed their recommendation. To that end, in October 1992 he retained Mr. Eastland to draft a family limited partnership agreement.

On March 2, 1993, Mr. Eastland sent to Mr. Black a draft partnership agreement for the creation of Black LP, and, on October 12, 1993, Black LP was created as a Texas limited partnership pursuant to the "Agreement and Articles of Partnership of Black Interests Limited Partnership" (the partnership agreement) executed on that date by the partners, Mr. Black and petitioner, the latter both in his individual capacity and as trustee of the grandson trusts. On October 12, 1993, a

certificate of limited partnership for Black LP was filed with the Texas secretary of state.

At the time of the formation of Black LP, Mr. Black, at age 91, was in good health. He was not suffering from any life-threatening illness, and he maintained an active lifestyle. He participated in the daily operations of Samuel P. Black & Associates, Inc., was an active member of the Erie board of directors, maintained a lively social schedule, remained an avid golfer, and traveled to Florida several times a year.

Upon the formation of Black LP, Mr. Black contributed to it all his Erie class A nonvoting stock (2,425,752 shares) and 390 of his 400 shares of Erie class B voting stock in exchange for all the class A limited partnership interests, an 83.985-percent class B limited partnership interest, and a 1-percent class B general partnership interest; petitioner contributed to Black LP 444,446 shares of Erie class A nonvoting stock in exchange for a 0.5-percent class B general partnership interest and a 13.317-percent class B limited partnership interest. In his capacity as trustee of the grandson trusts, petitioner contributed 19,276 shares of Erie class A nonvoting stock on behalf of each trust in exchange for two 0.599-percent class B limited partnership interests. The only Black family Erie stock held out of Black LP were the 125,000 shares that petitioner had pledged to PNC Bank and 20 class B voting shares, of which Mr. Black and petitioner each held 10 shares.

Upon the formation of Black LP, each partner therein (Mr. Black, petitioner, and the two trusts) received an interest in the partnership proportionate to the fair market value of the assets contributed.

Section 2.06 of the partnership agreement sets forth the purposes of Black LP as follows:

> Section 2.06. <u>Purposes</u>. The purposes of the Partnership are the following:
>
> (a) To consolidate the management of certain properties owned directly and indirectly by the family of Samuel P. Black, Jr.; to promote efficient and economical management of the properties by holding them in a single entity; to avoid the division of certain of the properties of the family of Samuel P. Black, Jr. in order to promote the greater sales potential of the properties; to avoid potential expensive litigation and disputes over certain of the properties of the family of Samuel P. Black, Jr. by providing mechanisms which will provide for management and procedures in Article VIII and Section 11.01 to resolve disputes; to provide mechanisms which will eliminate the potential in the future of any member of the family transferring his or her interest in the Partnership without first offering that interest to the other family members;
>
> (b) To engage generally in the insurance business, to acquire, own, hold, develop and operate insurance enterprises, either as operator, managing agent, principal, agent, partner, stockholder, syndicate member, associate, joint venturer, participant or otherwise; to invest funds in, and to raise funds to be invested in such business; to purchase, construct or otherwise acquire and own, develop, operate, lease, mortgage, pledge and to sell or otherwise dispose of insurance enterprises, and other properties and any interest therein; or to do any and all things necessary or incident thereto;
>
> (c) To acquire, invest, hold, own, develop, operate mortgage, pledge, sell or otherwise dispose of the stock of Erie Indemnity Company; to do any and all things necessary or incident thereto;
>
> (d) To manage and control investments in other partnerships, businesses and entities, whether debt,

equity, or otherwise; to hold, buy, sell, lease, pledge, mortgage, and otherwise deal in or dispose of those investments or similar interests;

     (e) To invest in stocks, bonds, securities, and other similar interests, including, without limitation, purchasing, selling, and dealing in stocks, bonds, notes, and evidences of indebtedness of any person, firm, enterprise, corporation or association, domestic or foreign and bonds and any other obligations of any government, state or municipality, school district or any political subdivision thereof, domestic or foreign, and bills of exchange and commercial paper, and any and all other securities of any kind, nature, or description whatsoever, to invest in gold, silver, grain, cotton and other commodities and provisions usually dealt in or on exchanges, or upon the over-the-counter-market; to form, organize, capitalize and invest in, alone or jointly with others, and to sell or otherwise dispose of the same to others, and to form corporations, partnerships, joint ventures, limited liability companies and other business entities, and in general, without limitation of the foregoing, to conduct such activities as are usual and customary in connection with, stocks, bonds and securities and other investments in corporations, partnerships, joint ventures, limited liability companies and other business entities;

     (f) To transact or engage in any other business that may be conducted in partnership form * * *

Management of Black LP was vested in the managing partner. Mr. Black was the managing partner from formation until October 16, 1998, when he ceded to petitioner his 1-percent general partnership interest and his responsibilities as a managing partner.

The partnership agreement generally prohibits a general or limited partner or the partner's spouse (including a divorced spouse) from transferring an interest in the partnership to persons or entities unrelated to any of the partners without "the written consent of the Partnership and all other Partners". The

partnership agreement grants to the partnership or the partners a right of first refusal to purchase any partnership interest with respect to any lifetime disposition, including involuntary dispositions and dispositions incident to the divorce of a partner, and any testamentary disposition upon the death of a partner or the spouse of a partner.

The partnership agreement requires that the net cashflow of the partnership (defined as the yearend excess of cash over reasonable reserves for working capital and other cash requirements) be distributed, at least annually, to each class B and general partner, pro rata.  It provides that, in any event, there be distributed to the partners sufficient amounts to enable the partners to discharge their income tax liabilities attributable to their interests in the partnership.  Except for those distributions and distributions in liquidation, the partnership agreement permits no distributions to partners until termination and liquidation of the partnership.  The partnership agreement also generally provides for the pro rata allocation of profits and losses to the class B general and limited partners.

The partnership agreement provides that, when Mr. Black is not serving as managing partner, the managing partner is prohibited, unless he obtains the prior written consent of a majority of the limited partnership interests, from (1) making any single investment or series of related investments during a calendar year requiring a total capital commitment greater than the lesser of 5 percent of the book value of the partnership

assets or $2,500,000, (2) acquiring debt of any kind that would result in the partnership's having outstanding aggregate debt equal to or greater than 10 percent of the book value of the partnership assets, (3) agreeing or consenting to the sale, lease, transfer, or other disposition (whether in one transaction or a series of related transactions) of any partnership asset or assets the value of which is equal to or greater than 5 percent of the book value of the partnership assets, (4) disposing of all or any portion of any partnership asset to a permitted assignee (as the partnership agreement defines that term) where the value of the asset, or the portion proposed to be disposed of, has a book value in excess of $100,000.

The partnership agreement provides that no general or limited partner shall have the right to withdraw from the partnership before it dissolves and liquidates.

Lastly, the partnership agreement provides that it "may be modified, terminated or waived only by a writing signed by the party to be charged with such modification, termination or waiver."

Activities of the Partnership

According to Mr. Black's wishes, Black LP retained all its Erie stock from formation (in 1993) until after Mr. Black died (in 2001). Indeed, upon becoming Black LP's sole managing partner in 1998, petitioner followed Mr. Black's wishes despite misgivings over Black LP's continued retention of Erie stock. Those misgivings arose out of his concern regarding the ongoing

feud between the Hirts and the Hagens and the adverse effect that feud might have on the company and the price of its stock.[4] Nonetheless, between 1993 and 2001, the net asset value of Black LP, consisting mostly of Erie stock, rose from approximately $80 million to more than $318 million.

During 1995 and 1996, Black LP purchased for $830,000 commercial condominium units in Erie, Pennsylvania, which it leased in part to Samuel P. Black & Associates, Inc., and in part to an independent insurance agency of which petitioner owned 65 percent and was president and treasurer. One or more of those condominium units was later leased to Erie after Samuel P. Black & Associates, Inc., moved out. In 1996, Black LP spent more than $37,000 making leasehold improvements to those units. In 2001, before Mr. Black's death, Black LP paid $89,900 for another commercial property in Erie, Pennsylvania, which, in 2002, it leased to Samuel P. Black & Associates, Inc.

In February, April, and October 2000, Black LP paid $924,000 to purchase 4,400 shares (approximately 80 percent of the outstanding stock) of Samuel P. Black & Associates, Inc.

Black LP's cumulative income, from 1994 through 2001, consisted of $27,835,476 attributable to Erie dividends and $100,561 attributable to other income, consisting almost entirely

---

[4]Because of his concerns regarding the management of Erie, petitioner ultimately caused Black LP to sell the remaining two-thirds of its Erie stock in 2005 and 2006, at which time Erie stock was publicly traded. The partnership had sold the first roughly one-third of the stock in a secondary offering after Mrs. Black's death in 2002. See infra.

of property rentals, and it made total distributions to partners of $25,659,526, over $20 million (or approximately 80 percent) of which was distributed to Mr. Black. That is, during that time, Black LP distributed an amount equal to approximately 92 percent of the Erie dividends it received.

Mr. Black's Assignments of Partnership Interests

On October 16, 1998, Mr. Black assigned his 1-percent general partnership interest in Black LP to petitioner.

Between 1993 and 2001, Mr. Black also made numerous gifts of his class A and class B limited partnership interests in Black LP to the Erie Community Foundation (which received his entire class A limited partnership interest), petitioner, the grandson trusts, his grandchildren individually (after their trusts terminated), and five separate charitable trusts Mr. Black created. Cumulatively, Mr. Black's gifts of class B limited partnership interests to family members (including the grandson trusts) and private charities constituted 6.8974 percent of the total class B limited partnership interest and reduced his initial 83.985-percent class B limited partnership interest to a 77.0876-percent interest.

On October 4, 1995, Mr. Black, as both settlor and trustee, established the Samuel P. Black, Jr. Revocable Trust (the original trust), whose terms he amended on March 20, 1998 (the amended trust) (together, the revocable trust), and to which, on August 27, 2001, he transferred his 77.0876-percent class B limited partnership interest in Black LP. The transfer was made

specifically subject to the partnership agreement "with respect to the class B Limited Partnership Interest assigned hereby, and the restrictions on transferability therein contained."

The Revocable Trust

The original trust document provided for the payment of the net income from the trust principal to Mr. Black (or for his benefit) for his life, and for the distribution of the trust estate, upon Mr. Black's death, as he "shall appoint and direct * * * in his last will and testament", or, failing to so "appoint and direct" (which, in fact, was the case), in the manner set forth in the original trust. The original trust document also provided for the creation of a marital trust for Mrs. Black as follows:

> If the Settlor's wife, IRENE M. BLACK, survives the Settlor, the Trustee shall hold IN TRUST, as the Marital Trust under Section C below, a legacy equal to the smallest amount, if any, needed to reduce the federal estate tax liability of the Settlor's estate to zero or to the lowest possible figure. In calculating this amount, the Trustee shall first take into account the amount of all other property, which, for federal estate tax purposes, is includable in the Settlor's gross estate and which passes or has passed in any manner (other than by the terms of this paragraph) to the Settlor's wife in a form which qualifies for the marital deduction. The Trustee shall also take into account all other deductions and all credits against the federal estate tax finally allowed to the Settlor's estate for federal estate tax purposes.

> In making the computation necessary to determine such amount the final determination in the federal estate tax proceeding of the Settlor's estate shall control. This amount shall be satisfied only out of assets that qualify for the marital deduction under the provisions of the Internal Revenue Code applicable at the time of the Settlor's death or out of the proceeds of such assets. Assets distributed in kind in satisfaction of this amount shall be distributed at

their market value on the date or dates of distribution.

The residual trust property, not held in the marital trust or otherwise distributed, was to go to petitioner, as was the after-tax principal of the marital trust upon Mrs. Black's death.

The amended trust document did not include the language in the original trust providing for the disposition of marital trust property to petitioner and instead substituted the following two provisions:

> If the Settlor's wife, IRENE M. BLACK, survives the Settlor, then the Trustee shall distribute to the Settlor's son, SAMUEL P. BLACK III, the sum of Twenty Million Dollars ($20,000,000). Any part or portion of this gift which the Settlor's son, SAMUEL P. BLACK III, disclaims shall be added to the "Samuel and Irene Black Endowment" established by the Settlor with The Pennsylvania State University for the purpose of enhancing Penn State Erie, The Behrend College.

> During his lifetime, the Settlor established an endowment known as the "Samuel and Irene Black Endowment" with the Pennsylvania State University for the purpose of enhancing Penn State Erie, The Behrend College. Following the death of the Settlor's wife, Irene M. Black, the Trustee shall distribute from the principal of the Marital Trust that amount, if any, which is needed to bring the funding level of the Endowment to Twenty Million dollars ($20,000,000). In determining the amount to be paid to the Endowment from the Marital Trust, the Trustee shall subtract all contributions made after 1995 by or on behalf of the Settlor during his lifetime, the Settlor's son, Samuel P. Black III, and from the Settlor's estate following his death, including contributions from The Black Family Foundation and contributions from The Samuel P. Black Fund at the Erie Community Foundation. The remaining principal of the Marital Trust shall be distributed to the Settlor's son, SAMUEL P. BLACK III, if living, otherwise in accordance with Section D of this Article I.

The effect of those two provisions was to provide a maximum bequest of $20 million to Penn State Erie, The Behrend College (Penn State Erie).[5]

Mr. and Mrs. Black's Nonpartnership Assets and Income

In 1993, at the time of the formation of Black LP, Mr. and Mrs. Black owned assets, other than Mr. Black's Erie stock, worth more than $4 million. Beginning in 1994 (the first full taxable year for Black LP) and for all years through 2001 (the year of Mr. Black's death), the Blacks received cumulative income from sources other than Black LP of approximately $5,610,000, ranging from a low of approximately $303,000 (in 1994) to a high of approximately $2,228,000 (in 2001).[6] Thus, both before and after the formation of Black LP, the Blacks received annual income from sources other than the Erie stock Mr. Black transferred to Black LP that was more than sufficient to cover their personal living expenses.

---

[5]Both at the creation of the $20 million bequest to Penn State Erie in 1998 and when it was time to fund that bequest after Mr. Black's death in 2001, Penn State Erie expressed a preference for cash, to which Mr. Black acquiesced. As a result of petitioner's disclaimer of the $20 million bequest to him, pursuant to the terms of the amended trust, Penn State Erie received a $20 million cash bequest.

[6]During that same period, the Blacks received cumulative income of approximately $22,544,000 from Black LP, which represented approximately 80 percent of their total income for the period.

Administration of the Estates

Implementation of the Wills and the Revocable Trust

Both Mr. and Mrs. Black appointed petitioner executor of their respective estates. In that capacity, he filed a Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, on behalf of each estate (Mr. Black's Federal estate tax return and Mrs. Black's Federal estate tax return, respectively). Mr. Black's Federal estate tax return was filed on September 12, 2002, and Mrs. Black's, on August 25, 2003.

Pursuant to Mr. Black's will, his residuary estate (everything other than his tangible personal property) was to be distributed according to the terms of the revocable trust. Mrs. Black bequeathed her residuary estate to petitioner. The foregoing provisions resulted in petitioner's receipt of (1) all Mr. Black's residuary estate not held in the marital trust and (2) the principal of the marital trust that remained after payment of the amount Mrs. Black's estate owed because of "any increase in taxes payable by her estate because of the inclusion in her gross estate of all or any portion of * * * [the] Marital Trust." Petitioner did, however, disclaim the $20 million specific bequest to him in the revocable trust. As a result, that bequest, by its terms, went to Penn State Erie and rendered inoperative the alternative method of providing $20 million to Penn State Erie through the marital trust.

The short period between Mr. Black's death, on December 12, 2001, and Mrs. Black's death, on May 25, 2002, did not provide

sufficient time to compute Mr. Black's pecuniary bequest to the marital trust provided for under the terms of the revocable trust, and the marital trust was not funded as of the date of Mrs. Black's death. Moreover, because, pursuant to the terms of the revocable trust, the marital trust terminated upon Mrs. Black's death, it was never funded. In his capacity as the executor of Mrs. Black's estate, petitioner deemed the marital trust to be funded on the date of her death. In that same capacity, petitioner also made an election on Mr. Black's estate tax return, under section 2056(b)(7), to treat the property funding the marital trust as qualified terminable interest property.[7] He filed a statement with Mr. Black's estate tax return explaining that he, as (successor) trustee of the revocable trust, intended to fund the marital trust with a portion of the 77.0876-percent class B limited partnership interest in Black LP that Mr. Black had assigned to the revocable trust during his lifetime.

---

[7]Sec. 2056(a) permits a deduction from the decedent's gross estate for "an amount equal to the value of any interest in property which passes * * * from the decedent to his surviving spouse". Pursuant to sec. 2056(b)(1), however, a marital deduction is not ordinarily available for property passing to a surviving spouse where the interest of the surviving spouse may terminate or fail, e.g., as in this case, upon the surviving spouse's death. Sec. 2056(b)(7), however, allows a marital deduction for qualified terminable interest property (QTIP), which is defined, in sec. 2056(b)(7)(B)(i), as property passing from a decedent in which the spouse has a qualified income interest for life, and to which a QTIP election applies. Respondent does not dispute that petitioner made a timely QTIP election.

The parties have stipulated (and we so find) that (1) the fair market value of a 77.0876-percent class B limited partnership interest in Black LP was $165,476,495 on December 12, 2001 (the date of Mr. Black's death), and (2) the fair market value of a 1-percent class B limited partnership interest in Black LP was $2,469,728 on May 25, 2002 (the date of Mrs. Black's death), and $2,281,124 on November 25, 2002 (the alternate valuation date elected by Mrs. Black's estate).

### The Secondary Offering

Mr. Black's estate reported a Federal estate tax liability of approximately $1.7 million, which, on or about September 12, 2002, it paid with its cash assets. Mrs. Black's estate lacked sufficient liquid assets to pay what were anticipated to be substantial Federal and State tax liabilities attributable to the Black LP class B limited partnership interest that was to constitute the principal of the marital trust.

In an attempt to borrow money to pay both tax liabilities and administration expenses on behalf of Mrs. Black's estate, petitioner, as executor of the estate, first approached commercial lending institutions, including PNC Bank, National City Bank, Wachovia Bank, Credit Suisse, First Boston, Goldman Sachs, and several local banks. None of those institutions would accept the pledge of a partnership interest in Black LP as security for a loan. Instead, each wanted Black LP to pledge its Erie stock as security. In addition, they required "collaring", an agreement that the Erie shares would be sold if their value

fell below a certain price. Petitioner found those terms unacceptable. He was particularly concerned that the Erie shares would drop in price because of the discord among Erie's board of directors and that the "collaring" requirement might result in the forced sale of the thinly traded Erie shares, which would further depress their price.

Petitioner next turned to Erie for a loan, but Erie was not interested in lending money to either the trust or the estate. On July 29, 2002, Mr. Cullen sent a letter to Erie's president and chief executive officer describing Mrs. Black's estate's need for cash and suggesting as one "liquidity solution" Erie's participation in a secondary offering of some of Black LP's Erie stock. Erie felt that a secondary offering would enhance Erie shareholder value, and it agreed with Messrs. Cullen and Black to participate in a secondary offering of about one-third of Black LP's Erie stock.

On January 29, 2003, Black LP sold 3 million shares of Erie class A nonvoting stock in a secondary offering at $34.50 per share.[8] As a condition of Erie's participation in the secondary offering, Black LP agreed to pay Erie's expenses incurred in connection therewith, which included an underwriting discount of $1.81 per share resulting in net proceeds to Black LP, before

---

[8]At the time, Black LP owned 8,726,250 shares of Erie class A common stock so that the 3 million shares sold in the secondary offering represented slightly more than one-third of Black LP's Erie stock.

other expenses, of $32.69 per share, for a total of approximately $98 million.

The Transfer of Funds From Black LP to Mrs. Black's Estate and The Revocable Trust

On October 11, 2002, in preparation for the secondary offering and on behalf of Mrs. Black's estate and the revocable trust, petitioner entered into a "Loan Commitment Agreement" with Black LP (the loan agreement) whereby Black LP (as "Lender"), upon receipt of the proceeds from the secondary offering, agreed to lend $71 million to Mrs. Black's estate and the revocable trust (as "Borrowers") "with all interest and principal due in full not earlier than November 30, 2007." The borrowers agreed to "reimburse the Lender" for all expenses it incurred in connection with the secondary offering.

On February 25, 2003, Black LP transferred $71 million to Mrs. Black's estate and the revocable trust in exchange for a promissory note for that amount executed by petitioner on behalf of both. The note provided for 6 percent simple interest with all principal and interest "due and payable not earlier than November 30, 2007."[9] The note provided that the borrowers "shall have no right to prepay principal or interest at any time." The note further provided for a "late charge" equal to 5 percent of

---

[9]At trial, the parties stipulated that the accumulated interest would, in fact, be paid on Nov. 30, 2007 (which was the next day), but Mr. Cullen testified that the $71 million principal amount would be refinanced, perhaps by means of installment payments, because Mrs. Black's estate did not have sufficient liquidity to repay it.

any payment "not received by the Lender within TEN (10) days after the due date" (referred to as an "overdue payment").

Also, on February 25, 2003, the parties to the loan agreement executed a "Pledge Agreement" and an "Assignment of Partnership Interest" whereby, as security for the $71 million loan, Mrs. Black's estate and the revocable trust pledged and assigned their class B limited partnership interest in Black LP to the lender, Black LP.

The interest due on November 30, 2007, was computed to be $20,296,274 and was deducted, in full, on Schedule J, Funeral Expenses and Expenses Incurred in Administering Property Subject to Claims, of Mrs. Black's estate tax return.

Mrs. Black's Estate's Use of the Funds Received From Black LP

Mrs. Black's estate dispersed the $71 million it received from Black LP (and an additional $309,946) as follows:

| | | |
|---|---|---|
| U.S. Treasury--Federal estate tax payment | $54,000,000 | |
| U.S. Treasury--Federal estate tax refund | (22,263,473) | $31,736,527 |
| Pennsylvania Department of Revenue--inheritance & estate taxes | | 15,700,000 |
| Erie Insurance Co. reimburse costs | | 982,070 |
| Petitioner--executor fees | | 1,155,000 |
| MacDonald Illig--legal fees | | 1,155,000 |
| Gift to Penn State Erie | | 20,000,000 |
| U.S. Treasury--fiduciary income taxes | | 515,973 |

|  |  |
|---|---|
| Pennsylvania Department of Revenue--fiduciary income taxes | 65,376 |
| Total | 71,309,946 |

The $982,070 payment was to reimburse Black LP for its reimbursement of Erie for Erie's expenses in conjunction with the secondary offering, including legal fees, the cost of filings with the Securities and Exchange Commission, and some of the costs incurred for meetings with investment firms. Mrs. Black's estate deducted that expenditure, in addition to the $1,155,000 payment to MacDonald Illig for legal services and the $1,155,000 paid to petitioner as executor and/or trustee fees, as administration expenses.[10]

## OPINION

## I. The Burden of Proof Issue

If a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the taxpayer's tax liability and the taxpayer complies with all substantiation requirements, maintains all required records, and cooperates with the Commissioner's reasonable requests for witnesses, section 7491 places the burden of proof on the Commissioner with respect to that issue. Sec. 7491(a)(1) and (2); Rule 142(a)(2). Petitioner alleges that he has satisfied all the prerequisites to the application of section 7491 and that, therefore, "Respondent bears the burden of proof under § 7491(a) with regard to each of the factual issues in this case". Respondent alleges that

---

[10]Mr. Black's estate did not claim any deduction for administration expenses.

petitioner has "not introduced credible evidence with respect to the material factual issues in this case as required by § 7491(a)."

We need not decide whether section 7491(a) applies to the material factual issues in these consolidated cases because we find that a preponderance of the evidence supports our resolution of each of those issues. Therefore, resolution of those issues does not depend on which party bears the burden of proof. See, e.g., Estate of Bongard v. Commissioner, 124 T.C. 95, 111 (2005).

II. The Section 2036 Issue

A. General Principles

Section 2001(a) imposes a tax "on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States." Section 2051 defines the taxable estate as "the value of the gross estate" less applicable deductions. Section 2031(a) specifies that the gross estate comprises "all property, real or personal, tangible or intangible, wherever situated", to the extent provided in sections 2033 through 2046.

Section 2033 broadly provides: "The value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death." Sections 2034 through 2046 then explicitly mandate the inclusion of several more narrowly defined classes of assets. Among those specific sections is section 2036, which provides, in pertinent part, as follows:

SEC. 2036.  TRANSFERS WITH RETAINED LIFE ESTATE.

     (a) General Rule.--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death--

          (1) the possession or enjoyment of, or the right to the income from, the property, or

          (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

Section 20.2036-1(c)(1)(i), Estate Tax Regs., further explains:  "An interest or right is treated as having been retained or reserved if at the time of the transfer there was an understanding, express or implied, that the interest or right would later be conferred."[11]

"The general purpose of * * * [section 2036] is 'to include in a decedent's gross estate transfers that are essentially testamentary' in nature."  Ray v. United States, 762 F.2d 1361, 1362 (9th Cir. 1985) (quoting United States v. Estate of Grace, 395 U.S. 316, 320 (1969)).  Accordingly, courts have emphasized that the statute "describes a broad scheme of inclusion in the gross estate, not limited by the form of the transaction, but

_____

     [11]During the audit years, the identical language was contained in sec. 20.2036-1(a), Estate Tax Regs.  The language was moved to sec. 20.2036-1(c)(1)(i), Estate Tax Regs., by T.D. 9414, 2008-35 I.R.B. 454, 458, and that provision is applicable to estates of decedents dying after Aug. 16, 1954.  See sec. 20.2036-1(c)(3), Estate Tax Regs.

concerned with all inter vivos transfers where outright disposition of the property is delayed until the transferor's death." Guynn v. United States, 437 F.2d 1148, 1150 (4th Cir. 1971).

Section 20.2036-1(a), Estate Tax Regs., refers to the section 20.2043-1, Estate Tax Regs., definition of "a bona fide sale for an adequate and full consideration in money or money's worth" (the parenthetical exception). In pertinent part, section 20.2043-1(a), Estate Tax Regs., provides: "To constitute a bona fide sale for an adequate and full consideration in money or money's worth, the transfer must have been made in good faith, and the price must have been an adequate and full equivalent reducible to a money value."

We must decide whether the Erie stock that Mr. Black contributed to Black LP, rather than his partnership interest therein, is includable in his gross estate under section 2036(a) because (1) his transfer of that stock to Black LP did not constitute a bona fide sale for an adequate and full consideration and (2) he retained an interest in the transferred stock within the meaning of section 2036(a)(1) or (2). We begin by considering whether Mr. Black's transfer of Erie stock to Black LP was a bona fide sale for adequate and full consideration. We find that it was.

B. <u>Mr. Black's Transfer of Erie Stock to Black LP as a Bona Fide Sale for Adequate and Full Consideration</u>

1. <u>Introduction</u>

To avail himself of the parenthetical exception, petitioner must show that the transfer was both (1) a bona fide sale and (2) for adequate and full consideration.  We consider each requirement in turn.

2. <u>Mr. Black's Transfer of Erie Stock to Black LP as a Bona Fide Sale of That Stock</u>

a. <u>General Principles</u>

The Court of Appeals for the Third Circuit, to which an appeal of these cases would lie, barring stipulation to the contrary, see sec. 7482(b), has stated that, whereas a "bona fide sale" does not necessarily require an "arm's length transaction", the sale (which we understand to include an exchange) still must be "made in good faith", <u>Estate of Thompson v. Commissioner</u>, 382 F.3d 367, 383 (3d Cir. 2004) (citing section 20.2043-1(a), Estate Tax Regs.), affg. T.C. Memo. 2002-246 (2002).  The Court of Appeals further stated that "A 'good faith' transfer to a family limited partnership must provide the transferor some potential for benefit other than the potential estate tax advantages that might result from holding assets in the partnership form."  <u>Id.</u> The Court of Appeals was "mindful of the mischief that may arise in the family estate planning context" but concluded that "such mischief can be adequately monitored by heightened scrutiny of intra-family transfers, and does not require a uniform

prohibition on transfers to family limited partnerships." Id. at 382.

The requirement that the transfer be in good faith--that is, provide the transferor some potential for benefit other than estate tax savings--is consistent with this Court's requirement, "[i]n the context of family limited partnerships", that the transferor have "a legitimate and significant nontax reason for creating the family limited partnership". See Estate of Bongard v. Commissioner, 124 T.C. at 118. We further required that "The objective evidence must indicate that the nontax reason was a significant factor that motivated the partnership's creation * * *. A significant purpose must be an actual motivation, not a theoretical justification." Id. A finding that the transferor sought to save estate taxes does not preclude a finding of a bona fide sale so long as saving estate taxes is not the predominant motive. Accord Estate of Mirowski v. Commissioner, T.C. Memo. 2008-74; see Estate of Schutt v. Commissioner, T.C. Memo. 2005-126 ("Thus, the proffered evidence is insufficient to establish that estate tax savings were decedent's predominant reason for forming Schutt I and II and to contradict the estate's contention that a true and significant motive for decedent's creation of the entities was to perpetuate his buy and hold investment philosophy.").

b. Arguments of the Parties

Petitioner argues that the "undisputed facts" show that the formation of Black LP was motivated by "'significant and

legitimate' non-tax reasons."  He notes that Mr. Black's primary reasons for wanting to form Black LP were to provide centralized long-term management and protection of the Black family's holdings in Erie stock, to preserve Mr. Black's buy-and-hold investment philosophy with respect to that stock, to pool the family's stock so that it could be voted as a block (thereby giving the family the swing vote in the not unlikely event of a split between the two H.O. Hirt trust shareholders), and to protect the Erie stock from creditors and divorce.  Petitioner further argues that Black LP accomplished those goals as follows:

- ! Adherence to Mr. Black's buy-and-hold investment philosophy resulted in the growth of Black LP's net asset value from $80 million when the partnership was formed in 1993 to over $315 million when Mr. Black died in 2001;

- ! the partnership prevented petitioner from selling or encumbering the $11 million of Erie stock he contributed to the partnership;

- ! the Erie stock the grandson trusts contributed to the partnership was not available for distribution to Mr. Black's grandsons when their trusts terminated in 1995 and 2000;

- ! the Black family's consolidated position allowed it to maintain a seat on the Erie board of directors through 2004, when, because he had lost confidence

in Erie, petitioner resigned from the board and decided to sell all the partnership's Erie stock;

**!** the partnership protected petitioner's Erie stock from equitable division in his divorce and reduced the value of the marital estate that his wife was entitled to receive.

Petitioner relies on the similarity of the facts here to the facts in Estate of Schutt v. Commissioner, supra, in which we found that the use of a family partnership to perpetuate the decedent's buy-and-hold investment strategy with respect to publicly traded Dupont and Exxon stock, in the "unique circumstances" of that case, constituted "a legitimate and significant non-tax purpose" for the formation of the partnership. Petitioner also cites other opinions for the proposition that consolidating family assets and providing for long-term centralized management of those assets are valid nontax purposes for forming a family limited partnership. E.g., Kimbell v. United States, 371 F.3d 257 (5th Cir. 2004); Estate of Mirowski v. Commissioner, supra; Estate of Stone v. Commissioner, T.C. Memo. 2003-309; Estate of Harrison v. Commissioner, T.C. Memo. 1987-8. Morever, petitioner argues that all the nontax reasons for forming Black LP were based on Mr. Black's actual, as opposed to theoretical, concerns.

Respondent rejects petitioner's arguments. Respondent acknowledges that Mr. Black subscribed to a buy-and-hold investment philosophy, particularly with respect to Erie stock,

and that Black LP was formed to hold the Erie stock that he, petitioner, and the grandson trusts previously held so that the family would continue to control that stock.  Respondent disagrees, however, that the transfers of Erie stock to Black LP were necessary to achieve that goal or that Mr. Black's alleged concerns over the potential disposition of Erie stock by petitioner and the grandson trusts were significant factors in his decision to form Black LP.  In reaching those conclusions, respondent purports to distinguish the caselaw on which petitioner relies.[12]

---

[12]With respect to the bona fide sale issue, the parties take opposing views on the similarity of these cases to Estate of Schutt v. Commissioner, T.C. Memo. 2005-126.  Whether we reach the same result here that we reached in Estate of Schutt will depend on our answers to two questions:  (1) Whether Mr. Black's buy-and-hold philosophy with respect to the family's Erie stock was a legitimate and significant nontax purpose for the formation of, and contribution of Erie stock to, Black LP, and (2) if so, whether, to ensure the implementation of that philosophy and the anticipated nontax benefits attendant thereupon, Mr. Black and petitioner (individually and as trustee of the grandson trusts) needed to transfer their Erie stock to Black LP.

Certain of respondent's arguments in support of his position that Mr. Black did not make a bona fide sale of Erie stock to Black LP, e.g., that Black LP did not have a functioning business operation, that Black LP held only passive assets, and that petitioner was not substantially involved in the formation of Black LP, allege the absence of factors that were also absent in Estate of Schutt, and, for that reason, are not persuasive in distinguishing that case.  Other of respondent's arguments, e.g., that Mr. Black allegedly failed to retain sufficient assets either to pay the estate and inheritance taxes that would be incurred by his and Mrs. Black's estates or to fund the $20 million endowment that he had established for Penn State University, relate to the issue of whether Mr. Black retained an interest in the Erie stock at the time of his death for purposes of sec. 2036(a)(1).  Therefore, they are inapposite to the bona fide sale question.

In the recent case of Estate of Jorgensen v. Commissioner, T.C. Memo. 2009-66, we rejected the taxpayer's argument that the decedent's "investment philosophy premised on buying and holding individual stocks with an eye toward long-term growth and capital preservation" was "a legitimate or significant nontax reason for transferring the bulk of one's assets to a partnership."  In reaching that decision, we distinguished Estate of Schutt v. Commissioner, T.C. Memo. 2005-126, on the ground that in that case "[t]he decedent's wife was the daughter of Eugene E. duPont, and the decedent hoped to maintain ownership of the stock traditionally held by the family including stock held by certain trusts created for the benefit of his children and grandchildren in the event those trusts terminated."  Estate of Jorgensen v. Commissioner, supra n.10.

In Estate of Schutt we acknowledged that the Court of Appeals for the Third Circuit, in Estate of Thompson v. Commissioner, 382 F.3d at 380, "suggested that the mere holding of an untraded portfolio of marketable securities weighs negatively in the assessment of potential nontax benefits available as a result of a transfer to a family entity."  We stated that we agreed with that premise, "particularly in cases where the securities are contributed almost exclusively by one person", citing Estate of Strangi v. Commissioner, T.C. Memo. 2003-145, and Estate of Harper v. Commissioner, T.C. Memo. 2002-121.  Nonetheless, we determined that the entities in question

had been formed for a legitimate and significant nontax purpose, reasoning as follows:

> In the unique circumstances of this case, however, a key difference exists in that decedent's primary concern was in perpetuating his philosophy vis-a-vis the stock of the * * * [trusts for his children and grandchildren] in the event of a termination of one of those trusts. Here, by contributing stock in the Revocable Trust, decedent was able to achieve that aim with respect to securities of the * * * trusts even exceeding the value of his own contributions. In this unusual scenario, we cannot blindly apply the same analysis appropriate in cases implicating nothing more than traditional investment management considerations.
>
> To summarize, the record reflects that decedent's desire to prevent sale of core holdings in the * * * trusts in the event of a distribution to beneficiaries was real, was a significant factor in motivating the creation of * * * [the entities at issue], was appreciably advanced by formation of * * * [those entities], and was unrelated to tax ramifications.
> * * *

Respondent attempts to distinguish these cases from Estate of Schutt v. Commissioner, supra, by arguing that, unlike the decedent's concerns in that case regarding the potential dissipation of the family's DuPont and Exxon stock, Mr. Black's concerns regarding the potential dissipation of the Erie stock held by petitioner and the grandson trusts were either ill founded (in the case of petitioner's stock) or insignificant (in the case of the grandson trusts' stock).

### c. Analysis

#### (1) Introduction

Between 1927, when Erie hired him to be its first claims manager, and 1997, when petitioner succeeded him as a member of the board of directors (a period covering almost his entire adult

life), Mr. Black was an employee, officer, and/or director of Erie. His ties to Erie and his belief in its financial prospects were easily the equal of the decedent's ties to and belief in DuPont and Exxon in Estate of Schutt v. Commissioner, supra.

Respondent does not disagree that Mr. Black desired to perpetuate the family's Erie stock holdings and, given Mr. Black's longstanding relationship with Erie and his strong belief in its favorable earnings prospects, that that was a legitimate and significant desire on Mr. Black's part. Respondent does disagree, however, that that desire was either a significant or legitimate motivation for the formation of Black LP.

Petitioner argues that Mr. Black formed Black LP as the best means of implementing his buy-and-hold philosophy to protect his family's Erie stock. Protecting his family's Erie stock was Mr. Black's principal nontax motivation, and that motivation arose out of his concerns regarding the potential dissipation of (1) petitioner's unpledged Erie stock and (2) the grandson trusts' Erie stock. Together, those two blocks of Erie stock were the only Black-owned Erie stock that Mr. Black did not himself control. We will address the legitimacy and significance of each of those concerns.

### (2) Petitioner's Erie Stock

Respondent argues that there was no evidence in 1993, when Black LP was formed, that petitioner intended to sell any of his Erie stock. He further argues that, although Mr. Black may have been unhappy with petitioner's decision to pledge some of his

Erie stock as collateral for a loan, the record does not support
a finding that Mr. Black "lacked confidence in petitioner's
ability to manage the family's assets."  Respondent concludes
that, had Mr. Black harbored any significant concerns about
petitioner's commitment to perpetuate his buy-and-hold investment
philosophy regarding the continued retention of the family's Erie
stock, he would not have transferred his managing partner
interest to petitioner in 1998 or arranged for petitioner to
succeed to his and the marital trust's limited partnership
interests when both he and Mrs. Black had died.  Respondent's
arguments overlook petitioner's main point, which is that,
although Mr. Black may have been satisfied that petitioner shared
his goal of retaining the family's existing investment in Erie
stock, he feared that petitioner's relationship with his wife and
in-laws might require him, against his better judgment or, even,
against his will, to dispose of or, alternatively, to pledge as
collateral for a new loan additional Erie stock.  In particular,
Mr. Black worried that petitioner's marriage would end in a
contentious divorce and about his father-in-law's present and
continuing need for financial support.

Petitioner's position is supported by the undisputed
testimony of Mr. Cullen, Mr. Black's business and estate planning
lawyer.  Respondent argues that any doubts Mr. Black may have had
concerning the status of petitioner's marriage were speculative
or theoretical and not based on fact.  As respondent states, at
the time of the formation of Black LP in 1993, petitioner had

been married for 28 years, and Mr. Black did not learn of petitioner's marriage difficulties and impending divorce until 1998.  As respondent suggests, Mr. Black's concerns were likely based on his negative opinion of both Karen Black and her parents.  Respondent does not suggest, however, that the facts on which that negative opinion was based were not true.  And respondent does not cast significant doubt on Mr. Cullen's testimony that Mr. Black did, in fact, harbor concerns that petitioner might be pressured into selling or pledging additional Erie stock to raise money for Karen Black or her parents.  Moreover, respondent argues that petitioner shared his father's buy-and-hold philosophy with respect to the family's Erie stock.  Yet that suggests that the previous borrowing secured by 125,000 Erie shares was at the request of Karen Black and her parents, which lends credence to Mr. Black's concerns.  We also note that Mr. Black's fears that petitioner's marriage would not last proved to be prophetic as divorce proceedings began 7 years later and concluded with a divorce 4 years after that.

Respondent also argues that, even if Mr. Black was, in fact, concerned about protecting petitioner's Erie stock in the event of divorce, putting the stock in Black LP did not enhance the protections already available under State law, citing 23 Pa. Cons. Stat. sec. 3501(a)(3) (1990).  Pursuant to that provision, "[p]roperty acquired by gift, except between spouses, bequest, devise or descent" does not constitute "marital property" subject to equitable division between divorcing spouses except to the

extent of the increase in the value of such property "prior to the date of final separation". Respondent argues that that provision afforded the same protection against Karen Black's potential acquisition of the Erie stock that Mr. Black transferred by gift to petitioner (which includes all petitioner's Erie stock) as did the transfer of that stock to Black LP. Respondent makes the same argument with respect to the Erie stock that petitioner stood to inherit upon Mrs. Black's death.

Respondent's argument overlooks the fact that, even though petitioner's Erie stock was nonmarital property exempt (except to the extent of some marital period appreciation) from equitable division under Pennsylvania law, that stock might nonetheless constitute the only significant asset available, as a practical matter, to fund whatever award might have been made to Karen Black under a divorce decree or marital settlement agreement. That point was acknowledged by respondent's counsel during his cross-examination of Mr. Cullen:

> Q (by respondent's counsel): Okay. I guess what I'm saying is does it matter? If the Erie stock is inherited, it's not marital property. The spouse can't reach it. If it's partnership units that are inherited, that's also nonmarital property, so maybe we're talking about the same thing, the advantage supposedly of the partnership interest is a valuation question of discounted appreciation, if you will, versus the full value of the appreciation?

> A: But I'm afraid that your question might assume that once you calculate the marital estate, and you look at the Erie stock, that she only gets the appreciation. One of the things that could be awarded to her as part of her number is the Erie stock. Do you follow me?

Q:  I don't because if it's nonmarital property, how can it be awarded to her?

THE COURT:  She's due a sum of money, and they can fund it with anything they choose?

MR. THORPE:  Yes.

THE WITNESS:  Yes, sir.

MR. THORPE:  That's my point, too.

THE WITNESS:  But the partnership prevented it from being funded with Erie stock.

The point is also illustrated by the 2005 Marital Settlement Agreement between petitioner and Karen Black, pursuant to which she was awarded the 125,000 Erie shares that, previously, had been pledged as security for a loan.  Conversely, Karen Black did not receive any portion of petitioner's interest in Black LP, which lends credence to Mr. Black's belief that the transfer of petitioner's unpledged Erie stock to a family partnership would help to protect it from Karen Black's property claims incident to any divorce.  Therefore, we conclude that Mr. Black reasonably believed that the transfer of Erie stock to Black LP would protect it from the claims of potential creditors, including Karen Black.  See Kimbell v. United States, 371 F.3d 257, 268 (5th Cir. 2004); Keller v. United States, __ F. Supp. 2d __, 104 AFTR 2d 2009-615, 2009-2 USTC par. 60,579 (S.D. Tex. 2009).

(3)  The Grandson Trusts' Erie Stock

Respondent argues that the potential dissipation of the Erie stock that Mr. Black transferred to the grandson trusts between October 1988 and January 1993 could not have been a significant

factor in Mr. Black's decision to form Black LP because (1) those transfers began less than 4 years before the decision to form Black LP and continued to occur even after that decision, suggesting Mr. Black's lack of concern that his grandsons might dispose of the stock upon vesting, and (2) the Erie stock in those trusts represented an "insignificant portion" (approximately 1.2 percent) of the family's holdings.

The fact that Mr. Black transferred Erie stock to the grandson trusts shortly before and even after the decision to form Black LP is not necessarily inconsistent with the undisputed testimony of Mr. Cullen and petitioner that Mr. Black was concerned that his grandsons would dispose of or borrow against the security of their Erie stock upon the termination of the trusts. In October 1988, when Mr. Black began funding the trusts with Erie stock, that stock was worth a fraction of its worth in 1992 and 1993, when Mr. Black made the decision to form Black LP. Also, at that time his grandsons were both less than 20 years old. Those facts suggest that the earlier transfers, between October 1988 and December 1990, did not concern Mr. Black because the value of the Erie stock transferred to the grandson trusts was relatively low, the number of Erie shares was small, and his grandsons had not reached an age at which their lack of ambition was important. Two years later, when the Erie stock had appreciated substantially and his grandsons' lack of ambition and financial responsibility persisted, Mr. Black transferred the trusts' Erie stock to a family partnership to keep it from his

grandsons.  That decision seems reasonable.  Moreover, Mr. Black's additional transfers to the grandson trusts in December 1992 and January 1993 were not inconsistent with his concerns regarding his grandsons because, we presume, he and petitioner had already decided to transfer the corpus of each of those trusts to the soon-to-be-formed family partnership.

In Estate of Schutt v. Commissioner, T.C. Memo. 2005-126, we found that the decedent's desire to prevent his grandchildren from selling DuPont and Exxon stock was a legitimate and significant nontax purpose for the creation of the entities at issue in that case.  Respondent argues that Estate of Schutt is distinguishable in that the children's trusts in that case controlled DuPont and Exxon stock worth approximately $50 million (which exceeded the value of DuPont and Exxon stock that Mr. Schutt himself contributed to the entities at issue), an amount representing "a substantial portion of the Schutt family's wealth."  Respondent notes that, in contrast, "the stock held by Mr. Black's grandsons' trusts was, at the time of the Partnership's formation, relatively insignificant both in terms of its value ($963,800) and as a percentage (approximately 1%) of the Black family wealth."  Respondent further notes that, in Estate of Schutt, there was a history of stock sales by grandchildren that is absent in these cases, which is to say, Mr. Black's concerns, unlike Mr. Schutt's, were purely speculative.

We do not agree that Mr. Black's concerns regarding his grandsons were speculative or, in the language of this Court in

Estate of Bongard v. Commissioner, 124 T.C. at 118, a "theoretical justification" rather than an "actual motivation". We find that Mr. Black's concerns regarding his grandsons' potential dissipation of all or some the Erie stock they would receive upon the partial and full termination of their trusts was reasonable given their unwillingness to seek employment and their financial inexperience, and that those concerns motivated Mr. Black to transfer the Erie stock in those trusts to Black LP.

We agree that the Erie class A nonvoting stock in the grandson trusts, by itself, was, as respondent argues, "relatively insignificant" as a percentage of the value of the family's Erie stock. But to focus on that stock in isolation is improper. Mr. Black was concerned about the potential dissipation of both that stock and petitioner's stock, which, together, represented more than 16.6 percent of the family's Erie class A nonvoting stock and, in 1993, had a value of more than $12 million. Although the value of that Erie stock is not nearly as great as the value of the grandchildren trust stock in Estate of Schutt v. Commissioner, supra, it is nonetheless substantial, and we find that Mr. Black's concern regarding the potential dissipation of all or some of that stock was significant as well as legitimate.

Therefore, we agree with petitioner that these cases, like Estate of Schutt, present a set of unique circumstances that, on balance, require a finding that Black LP was formed for a

legitimate and significant nontax purpose; i.e., to perpetuate the holding of Erie stock by the Black family.[13]

### d. Conclusion

Mr. Black's transfer of Erie stock to Black LP constituted a bona fide sale of that stock.

### 3. Mr. Black's Sale of Erie Stock to Black LP as a Sale for Adequate and Full Consideration in Money or Money's Worth

### a. Analysis

In Estate of Bongard v. Commissioner, 124 T.C. at 118, we held that the second prong of the two-part test for finding a bona fide sale for adequate and full consideration is met if "the transferors received partnership interests proportionate to the value of the property transferred." The parties have stipulated (and we have found) that each partner in Black LP "received an interest in the Partnership proportionate to the fair market value of the assets contributed." Relying on that stipulation, petitioner concludes: "Thus, the 'adequate and full consideration' prong has been satisfied."

After noting petitioner's suggestion that "the test for the 'bona fide sale exception' adopted by this Court in * * * [Estate of Bongard v. Commissioner, 124 T.C. 95 (2005),] is the same as

_____

[13]Assuming Mr. Black's desire to perpetuate the holding of Erie stock by the Black family constituted a legitimate and significant nontax purpose for the formation of Black LP, respondent does not argue, in the alternative, that Mr. Black's transfer of less than all of his Erie stock in exchange for a controlling general partnership interest in Black LP would have sufficed to accomplish that purpose. Therefore, we do not address that alternative argument.

the test set forth by the Third Circuit in Estate of Thompson v. Commissioner, 382 F.3d 367 (3d Cir. 2004)", respondent states: "Petitioners misapprehend the Estate of Bongard test." Respondent then argues that, under Estate of Bongard, "in the absence of a tax-independent purpose, the receipt of proportionate partnership interests does not constitute the receipt of any consideration, but is, rather, a mere recycling of value." Respondent then quotes Estate of Thompson v. Commissioner, 382 F.3d at 381:

> Where, as here, the transferee partnership does not operate a legitimate business, and the record demonstrates the valuation discount provides the sole benefit for converting liquid, marketable assets into illiquid partnership interests, there is no transfer for consideration within the meaning of § 2036(a).

Respondent concludes as follows:

> Each of these courts is saying essentially the same thing, that the receipt of a proportionate interest in an entity that is imbued with a tax-independent purpose does not deplete the gross estate. Stated another way, receipt of a proportionate interest is necessary, but not sufficient, to constitute adequate consideration. In the absence of a tax-independent purpose, the interest constitutes no consideration. Indeed, that is exactly what the Bongard court found with regard to the partnership interests received in exchange for the LLC interests. 124 T.C. at 129.

> Here, * * * the record establishes that the Partnership did not operate a legitimate business and that the sole purpose for converting Mr. Black's liquid interest in his Erie stock into an illiquid interest in the Partnership was to obtain valuation discounts for gift and estate tax purposes. Consequently, petitioners have not established that the transfer satisfies the "adequate and full consideration" prong of the "bona fide sale exception."

Thus, respondent argues that the adequate and full consideration prong depends on the legitimate and significant nontax purpose prong. Of perhaps greater significance to these cases, which, as noted supra, if appealed, are likely to be appealed to the Court of Appeals for the Third Circuit, is respondent's argument that his analysis reflects the position of both that court, as set forth in Estate of Thompson v. Commissioner, supra, and this Court, as set forth in Estate of Bongard v. Commissioner, supra.

We have determined that Mr. Black had a legitimate and significant nontax purpose for his transfer of Erie stock to Black LP. Because respondent stipulated that the Black LP partners received partnership interests proportionate to the value of the Erie stock they transferred, he has, in effect, conceded that Mr. Black satisfied the adequate and full consideration prong, and we so find.

Our determination herein is consistent with our decision in Estate of Schutt v. Commissioner, T.C. Memo. 2005-126, which was also appealable to the Court of Appeals for the Third Circuit. In that case, we observed that, in Estate of Bongard v. Commissioner, 124 T.C. at 124, the presence of the following four factors supported a finding that the adequate and full consideration requirement had been satisfied: (1) The participants in the entity at issue received interests proportionate to the value of the property each contributed to the entity; (2) the respective contributed assets were properly

credited to the transferors' capital accounts; (3) distributions required negative adjustments to distributee capital accounts; and (4) there was a legitimate and significant nontax reason for formation of the entity.

In these cases, respondent has conceded that the first factor is present, and we have determined that the fourth factor is present. The Black LP partnership returns filed for 1994 and subsequent years demonstrate that the second and third factors are present, too.

In Estate of Schutt v. Commissioner, supra, like respondent in this case, we viewed the position of the Court of Appeals for the Third Circuit in Estate of Thompson v. Commissioner, 382 F.3d 367 (3d Cir. 2004), as being consistent with our position in Estate of Bongard v. Commissioner, 124 T.C. 95 (2005), commenting as follows:

> The Court of Appeals for the Third Circuit has likewise opined that while the dissipated value resulting from a transfer to a closely held entity does not automatically constitute inadequate consideration for section 2036(a) purposes, heightened scrutiny is triggered. Estate of Thompson v. Commissioner, 382 F.3d at 381. To wit, and consistent with the focus of the Court of Appeals in the bona fide sale context, where "the transferee partnership does not operate a legitimate business, and the record demonstrates the valuation discount provides the sole benefit for converting liquid, marketable assets into illiquid partnership interests, there is no transfer for consideration within the meaning of § 2036(a)." Id.

The family limited partnership in Estate of Bongard, like Black LP, did not conduct an active trade or business. In Estate of Bongard, the legitimate and significant nontax purpose for the transfer of operating company stock to the partnership was "to

facilitate a corporate liquidity event" for the operating

company. Therefore, we conclude that, by treating Estate of

Bongard and Estate of Thompson as consistent with respect to

their application of the parenthetical exception, respondent

concedes, and, as demonstrated by our opinion in Estate of

Schutt, this Court agrees, that a family limited partnership that

does not conduct an active trade or business may nonetheless be

formed for a legitimate and significant nontax reason.[14]  In

Estate of Thompson v. Commissioner, 382 F.3d at 383, the Court of

Appeals stated:[15]

---

[14]That respondent does not require the legitimate and significant nontax purpose to be the partnership's operation of a business is also made clear both by his failure to make that argument on brief and by the following colloquy between respondent's counsel and the Court at the end of trial:

    THE COURT:  But this wasn't a business that was put into the --

    MR. THORPE:  Yes.  Right.  Well, let me rephrase our position.  I don't think our position is so restricted to say that under the * * * [Bongard] test, it has to be strictly a business purpose.  I mean, certainly I think * * * [Bongard] would indicate that it could be some significant, legitimate, nontax purpose.  That's pretty broad.

    THE COURT:  Okay.  So would avoiding a family dispute suffice for the first prong of the * * * [Bongard] test?

    MR. THORPE:  Yes.  If it's significant and legitimate * * *

[15]Judge Greenberg, concurring in Estate of Thompson v. Commissioner, 382 F.3d 367, 383 (3d Cir. 2004), joins the majority opinion "without reservation" but appears to read that opinion as suggesting that, for a discounted, proportionate interest in a family limited partnership to constitute full and adequate consideration, the partnership hold a "legitimate"

(continued...)

After a thorough review of the record, we agree with the Tax Court that decedent's inter vivos transfers do not qualify for the § 2036(a) exception because neither the Thompson Partnership nor Turner Partnership conducted any legitimate business operations, <u>nor provided decedent with any potential non-tax benefit from the transfers</u>. [<u>Estate of Thompson v. Commissioner</u>, 382 F.3d at 383; emphasis supplied.]

### b. <u>Conclusion</u>

Mr. Black's transfer of Erie stock to Black LP was made for adequate and full consideration.

### C. <u>Application of Section 2036(1) and (2)</u>

Because we have concluded that Mr. Black's transfer of Erie stock to Black LP constituted a bona fide sale for adequate and full consideration for purposes of section 2036(a), the fair market value of that stock is not includable in Mr. Black's gross

---

[15](...continued) business. Judge Greenberg's point is that the Court's refusal to apply the sec. 2036(a) parenthetical exception in the case "should not discourage transfers in ordinary commercial transactions, even within families". In that context, Judge Greenberg states:

> This * * * point is important because courts should not apply section 2036(a) in a way that will impede the socially important goal of encouraging accumulation of capital <u>for commercial enterprises</u>. Therefore in an <u>ordinary commercial context</u> there should not be a recapture under section 2036(a) and thus the value of the estate's interest in the entity, though less than the value of a pro rata portion of the entity's assets, will be determinative for estate tax purposes. * * * [<u>Id.</u> at 386; emphasis supplied.]

The third judge on the panel joined Judge Greenberg's concurring opinion. In the absence of respondent's reliance on (or even discussion of) the concurring opinion in <u>Estate of Thompson</u>, we do not opine as to its impact, if any, on these cases.

estate under either section 2036(a)(1) or (2), and we need not further consider the application of either of those provisions.

D. Conclusion

The fair market value of Mr. Black's partnership interest in Black LP, rather than the fair market value of the Erie stock that he contributed thereto, is includable in his gross estate.

III. The Marital Deduction Issue

Because we have decided that the fair market value of Mr. Black's partnership interest in Black LP, rather than the fair market value of the Erie stock that he contributed thereto, is includable in his gross estate, the marital deduction to which Mr. Black's estate is entitled under section 2056 must be computed according to the value of the partnership interest that actually passed to Mrs. Black, not according to the underlying Erie stock apportionable to that interest. Therefore, the marital deduction issue is moot.

IV. The Date of Funding Issue

A. The Arguments of the Parties

As found supra, petitioner, in his capacity as trustee of the revocable trust, decided to fund the marital trust with a portion of the 77.0876-percent class B limited partnership interest in Black LP that Mr. Black had assigned to the revocable trust. Pursuant to the terms of the revocable trust, assets distributed in kind to fund the marital trust were required to be distributed "at their market value on the date or dates of distribution." Mrs. Black died before the amount of the

pecuniary bequest could be determined and the marital trust funded, and, because the trust was to terminate upon Mrs. Black's death, it was never actually funded. To deem the trust to have been funded was necessary, however, to determine the amount includable in Mrs. Black's gross estate under section 2044(b)(1)(A). That section requires that her gross estate include the value of all property with respect to which Mr. Black's estate was entitled to a marital deduction under section 2056(b)(7).[16] Petitioner selected the date of her death as the deemed date of funding.

The parties have stipulated that the fair market value of a 1-percent class B limited partnership interest in Black LP was $2,146,603, on December 12, 2001 (the date of Mr. Black's death), and $2,469,728 on May 25, 2002 (the date of Mrs. Black's death). If the marital trust is deemed to have been funded on the date of Mr. Black's death, the number of class B limited partnership units needed to fund the pecuniary bequest to that trust will be greater than the number of such units needed to fund that bequest on the date of Mrs. Black's death. In that event, the fair market value of the marital trust on the date of Mrs. Black's death and, therefore, the amount includable in her gross estate under section 2044(b)(1)(A) will be greater than if the marital trust is deemed to have been funded with the lesser number of class B limited partnership units determined by the value of those units on the date of her death.

---

[16]See supra note 7.

Citing the requirement in the revocable trust that the marital trust terminate at Mrs. Black's death, petitioner argues that "logic dictates that the Marital Trust must be deemed to be funded as of that date."  In support of his position, petitioner cites section 20.2044-1(e), Example (8), Estate Tax Regs.  Respondent counters that, under the terms of the revocable trust, Mrs. Black's "legacy passed to her upon Sam Black's death", and, "[a]ccordingly, the amount comprising Irene Black's legacy is determined as of the date of Sam Black's death, reflecting any adjustments to the value of Sam Black's gross estate as finally determined."  Respondent argues that section 20.2044-1(e), Example (8), Estate Tax Regs., "sheds no light on the issue of when a QTIP trust should be deemed funded when the surviving spouse dies before it is actually funded."

B.  Analysis

In general, the amount includable in the decedent's gross estate under section 2044 "is the value of the entire interest in which the decedent had a qualifying income interest for life, determined as of the date of the decedent's death (or the alternate valuation date, if applicable)."  Sec. 20.2044-1(d)(1), Estate Tax Regs.  That general rule is illustrated by section 20.2044-1(e), Example (1), Estate Tax Regs., as follows:

> Inclusion of trust subject to election.  Under D's will, assets valued at $800,000 in D's gross estate (net of debts, expenses and other charges, including death taxes, payable from the property) passed in trust with income payable to S for life.  Upon S's death, the trust principal is to be distributed to D's children. D's executor elected under section 2056(b)(7) to treat the entire trust property as qualified terminable

interest property and claimed a marital deduction of $800,000. S made no disposition of the income interest during S's lifetime under section 2519. On the date of S's death, the fair market value of the trust property was $740,000. S's executor did not elect the alternate valuation date. The amount included in S's gross estate pursuant to section 2044 is $740,000.

Section 20.2044-1(e), Example (8), Estate Tax Regs., on which petitioner relies, provides as follows:

Inclusion of trust property when surviving spouse dies before first decedent's estate tax return is filed. D dies on July 1, 1997. Under the terms of D's will, a trust is established for the benefit of D's spouse, S. The will provides that S is entitled to receive the income from that portion of the trust that the executor elects to treat as qualified terminable interest property. The remaining portion of the trust passes as of D's date of death to a trust for the benefit of C, D's child. The trust terms otherwise provide S with a qualifying income interest for life under section 2056(b)(7)(B)(ii). S dies on February 10, 1998. On April 1, 1998, D's executor files D's estate tax return on which an election is made to treat a portion of the trust as qualified terminable interest property under section 2056(b)(7). S's estate tax return is filed on November 10, 1998. The value on the date of S's death of the portion of the trust for which D's executor made a QTIP election is includible in S's gross estate under section 2044.

Thus, Example (8) confirms that the general rule applies to the valuation of the property in a QTIP marital deduction trust (i.e., that it be valued as of the date of the grantee spouse's death) when (as in these cases) the grantee spouse dies before the estate tax return for the grantor spouse is filed. The foregoing regulation and the above-quoted examples illustrating its application necessarily presuppose that the marital trust is funded before the beneficiary spouse dies. As respondent notes, however, neither the regulation nor Example (8) addresses the

actual date upon which the marital trust is considered to have been established (funded).

Although respondent successfully rebuts petitioner's reliance on the above-cited regulations, he does not mount a successful defense of his own position.  To begin with, respondent misstates the terms of the revocable trust.  They do not support respondent's argument that Mrs. Black's legacy passed to her upon Mr. Black's death.  The pertinent language of the revocable trust states:  "If * * * [Mrs. Black] survives * * * [Mr. Black], the Trustee shall hold IN TRUST, as the Marital Trust * * * a legacy equal to * * * [the pecuniary bequest]." The amount of the pecuniary bequest was not ascertainable until Mr. Black's Federal estate tax liability was known, and, because of the need to appraise the date-of-death value of the principal asset in Mr. Black's estate (his 77.0876-percent class B limited partnership interest in Black LP) to compute that liability, that amount was not known on the date of Mr. Black's death.

Mr. Black's Federal estate tax return was filed on September 12, 2002, more than 3 months after Mrs. Black's death on May 25, 2002.  Moreover, the outside appraisal of the value (on the date of his death) of Mr. Black's 77.0876-percent class B limited partnership interest in Black LP was dated September 11, 2002, 1 day before his Federal estate tax return was filed.  Although the result of that appraisal must have been known before September 11, 2002, Mr. Cullen testified credibly that it was not known until after Mrs. Black's death.

Had Mrs. Black lived long enough to allow for the funding of her marital trust, then, as required by the terms of the revocable trust, that funding would have been accomplished with a class B limited partnership interest in Black LP the size of which would have been determined with reference to its fair market value on the date of distribution from the revocable trust to the marital trust. There is no reason to apply a different rule to a deemed distribution of that interest to the marital trust. The issue is what date, after Mr. Black's death, to choose. Because the marital trust was to terminate upon Mrs. Black's death, that is the last possible date on which it could have been funded. We agree with petitioner that to pick that date, which is the date closest to what would have been the actual date of the distribution to the marital trust had Mrs. Black survived, as the deemed date of funding is logical and reasonable.

Lastly, under the terms of the revocable trust, petitioner had the option of funding the marital trust with cash. Had Mrs. Black survived long enough to enable petitioner to fund the marital trust with cash before her death, and had he been able (and inclined) to sell a portion of the revocable trust's 77.0876-percent class B limited partnership interest in Black LP to raise that cash, he would have sold that interest for its current fair market value. He would not have sold a greater interest determined with reference to the fair market value of Black LP class B limited partnership units as of December 12,

2001, the date of Mr. Black's death.  We see no reason to reach an inconsistent result where the marital trust is funded (or deemed to have been funded) in kind with a class B limited partnership interest in Black LP.

C.  Conclusion

For purposes of determining the value of the marital trust property includable in Mrs. Black's gross estate under section 2044, the marital trust that Mr. Black established for Mrs. Black's benefit should be deemed funded and the fair market value of the property that was to constitute the trust corpus should be determined as of May 25, 2002, the date of her death, not as of December 12, 2001, the date of his death.

V.  The Interest Deductibility Issue

A.  General Principles

Section 2053(a)(2) provides that "the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts * * * for administration expenses * * * as are allowable by the laws of the jurisdiction * * * under which the estate is being administered."[17]  Section 20.2053-3(a), Estate Tax Regs., provides, in pertinent part:  "The amounts

---

[17]Neither party suggests that Pennsylvania law bars the executor of an estate from claiming an interest expense as an administration expense with respect to the estate.  Therefore, for purposes of these cases, we find that the interest expense for which petitioner claims a deduction was properly incurred under Pennsylvania law, despite the absence of evidence that it was specifically approved by a Pennsylvania court.  See sec. 20.2053-1(b)(2), Estate Tax Regs. (A "deduction * * * of a reasonable expense of administration will not be denied because no court decree has been entered if the amount would be allowable under local law.").

deductible from * * * [the] gross estate as 'administration expenses' * * * are limited to such expenses as are actually and necessarily, incurred in the administration of the decedent's estate". See also Estate of Todd v. Commissioner, 57 T.C. 288, 296 (1971). Section 20.2053-1(b)(3), Estate Tax Regs., provides that an item may be deducted on the estate tax return "though its exact amount is not then known, provided it is ascertainable with reasonable certainty, and will be paid. No deduction may be taken upon the basis of a vague or uncertain estimate."

In Estate of Graegin v. Commissioner, T.C. Memo. 1988-477, we held that the obligation to make a balloon payment of interest upon the maturity of a 15-year promissory note for repayment of an amount borrowed from the decedent's closely held corporation to pay his estate's Federal estate tax liability entitled the estate to an immediate deduction for the interest as an administration expense under section 2053(a)(2). Both principal and interest were due in a single payment on the 15th anniversary due date, and prepayment of both was prohibited. In sustaining the deduction, we noted that the amount of interest was capable of precise calculation. Although we were "disturbed" by the single payment of principal and interest, we found it "not unreasonable" in the light of the anticipated availability of the assets of decedent's spouse's trust to repay partially both principal and interest upon maturity of the note, the term of which had been set according to decedent's spouse's life expectancy.

We have generally held that when, to pay the debts of an estate, an executor borrows money instead of selling illiquid assets, interest on the loan is deductible. See, e.g., Estate of Bahr v. Commissioner, 68 T.C. 74 (1977); Estate of Todd v. Commissioner, supra; Estate of Graegin v. Commissioner, supra. Moreover, we have so held when the loan was made by a company stock of which was included in the value of the gross estate and which (1) was owned by the decedent's family and (2) "was neither able nor required to redeem enough * * * [company] shares to provide funds to pay * * * [all debts of the estate] when due". McKee v. Commissioner, T.C. Memo. 1996-362. In that case, the executors (who were also directors of the company lender) anticipated that the company stock would increase in value, and we concluded that "borrowing funds, rather than selling stock, allowed decedent's estate to more easily meet its burdens by taking advantage of the increasing value of the stock."

B. Arguments of the Parties

Petitioner argues that the loan from Black LP was necessary "to solve Mrs. Black's Estate's liquidity dilemma"; i.e., to provide the funds needed to pay estate taxes and administration expenses. He stresses that the amount of the loan was reasonable and that, because prepayment of principal and interest was prohibited, the amount of interest on the loan was fixed and capable of calculation when the promissory note was executed, not "vague or uncertain" within the meaning of section 20.2053-1(b)(3), Estate Tax Regs. Petitioner concludes that, under the

foregoing authorities, the interest on the note to maturity was deductible in full on the Form 706 filed by Mrs. Black's estate. In reaching that conclusion, petitioner argues that, under such cases as Estate of Todd v. Commissioner, supra, petitioner, as executor of Mrs. Black's estate, "exercised reasonable business judgment" when he borrowed the necessary funds rather than cause Black LP either to distribute those funds to the estate or to redeem a portion of the estate's interest (through the marital trust) in Black LP.  Petitioner further notes that, pursuant to the partnership agreement, Black LP was not required to make a distribution to or redeem an interest from Mrs. Black's estate to fund the estate's tax liabilities.  Petitioner also argues that, although petitioner acted on behalf of both the borrowers and the lender, he "did not stand alone or unrestricted on either side of the transaction" because he had fiduciary responsibilities to both, particularly to the other partners in Black LP.  Lastly, petitioner argues that, under both the objective test and the "economic reality" test set forth in Geftman v. Commissioner, 154 F.3d 61, 70, 75 (3d Cir. 1998), revg. in part and vacating in part T.C. Memo. 1996-447, the loan to Mrs. Black's estate was bona fide because (1) there was a note, security, interest charges, a repayment schedule, actual repayment of the loan, and other factors that indicate an unconditional obligation to repay, and (2) the economic realities surrounding the relationship between the borrowers and the lender demonstrate that there was a reasonable expectation or enforceable obligation of repayment.

Respondent counters that the loan (and, hence, the payment of interest) was neither necessary nor bona fide. In arguing that the loan was unnecessary, respondent states that "there was no liquidity problem that would justify the loan." In support of that position, respondent stresses that petitioner, as executor of both Mr. and Mrs. Black's estates and as managing and majority partner in Black LP, was in a position to distribute Erie stock held by Black LP to Mrs. Black's estate by way of either a partial, pro rata distribution to the partners of Black LP or a partial redemption of the estate's interest, neither of which would have adversely affected the interests of the charitable trust partners. In support of his argument that the transfer of funds was not a bona fide loan, respondent states that the transaction had no economic effect other than to generate an estate tax deduction for the interest on the loan. According to respondent, that is because the only way the borrowers can repay the alleged loan is to have Black LP make an actual or deemed distribution of Erie stock (or proceeds from the sale thereof) to them (whether or not in partial redemption of their partnership interest) followed by an actual or deemed repayment of the stock (or proceeds) to Black LP in discharge of the note, which would result in a circular flow of either the Erie stock or the proceeds from its sale by Black LP. Respondent concludes: "Other than the favorable tax treatment resulting from the transaction (a sec. 2053 deduction for interest expense that the parties are essentially paying to themselves), it is difficult to

see what benefit was derived from this circular transfer of funds." Lastly, respondent argues that, contrary to petitioner's argument, the transaction did not satisfy the prerequisites for bona fide loan status as set forth in Geftman v. Commissioner, supra, and in Estate of Rosen v. Commissioner, T.C. Memo. 2006-115. In particular, respondent argues that by providing for payment "no earlier than November 30, 2007", the note lacked a fixed maturity date, and that Mr. Cullen's "vague testimony that an installment arrangement will be worked out in the future [because of the borrowers' inability to repay the entire principal on November 30, 2007][18] hardly confirms an intent that the loan be repaid."

C. Analysis

We find that the $71 million loan from Black LP to Mrs. Black's estate and the revocable trust, and the borrowers' payment of interest thereon, was unnecessary. Therefore the interest is not deductible. See sec. 20.2053-3(a), Estate Tax Regs.

The only significant asset in Mrs. Black's estate was the Black LP partnership interest to be transferred from the revocable trust to the marital trust. Between 1994 and 2001, Black LP's total income was less than $28 million, and its total distributions to partners were less than $26 million. Even assuming equivalent income and distributions to partners between February 25, 2003, the date of the loan, and November 30, 2007,

---

[18]See supra note 9.

the purported due date for repayment of the loan, timely repayment by the borrowers of the $71 million loan principal out of partnership distributions (derived almost entirely from dividends on Black LP's Erie stock) was, on the date of the loan, inconceivable. Thus, the borrowers knew (or should have known) that, on the loan date, payment of the promissory note, according to its terms, could not occur without resort to Black LP's Erie stock attributable to the borrowers' class B limited partnership interests in Black LP.[19]

Petitioner argues that the borrowers had no right under the partnership agreement to require a distribution to them of assets (i.e., Erie stock) either as part of a pro rata distribution to partners or in partial redemption of their partnership interests. But the partnership agreement provided for the modification thereof, and a modification permitting either a pro rata distribution of Erie stock to the partners or a partial redemption of the borrowers' partnership interests would not have violated petitioner's fiduciary duties, as managing partner, to any of the partners.

Assuming additional sales or pro rata distributions of Erie stock would have been considered undesirable, the only feasible

---

[19]Our conclusion that repayment of the note necessarily would require a sale of the Erie stock attributable to the borrowers' partnership interests in Black LP is premised on the assumption that, on the date they executed the promissory note, the borrowers intended to repay the loan in full on Nov. 30, 2007. Petitioner does not argue to the contrary. He argues only that the eventual decision to refinance the loan does not alter its status as a bona fide loan.

means of repaying the loan by the purported due date of November 30, 2007, would have been for Black LP to make an actual or deemed distribution of Erie stock to the borrowers in partial redemption of their interests in the partnership and for the borrowers to make an actual or deemed return of the stock to Black LP in discharge of the promissory note. That transaction, had it, in fact, occurred, would have demonstrated that the loan was unnecessary because the parties thereto would have been in exactly the same position as they would have been had Black LP used Erie stock to redeem part of the partnership interests of the estate and revocable trust, and, in 2003, to pay the debts of the estate, had they sold that Erie stock (e.g., by means of a secondary offering identical, except for the identity of the seller, to the one that actually occurred).[20] The only distinction between the loan scenario and the partial redemption scenario is that the former gave rise to an immediate estate tax deduction for interest in excess of $20 million, offset by a substantially smaller income tax expense (because of the passthrough of interest income) to the Black LP partners. That the loan scenario, like the partial redemption scenario, required a sale of Erie stock to discharge the debts of Mrs. Black's estate, i.e., that Erie stock was available and actually used for

---

[20]Alternatively, the partial redemption scenario could have been structured as a sale of Erie stock by Black LP pursuant to the secondary offering that actually occurred followed by a distribution of $71 million in cash to the estate and the revocable trust in redemption of their partnership interests in Black LP.

that purpose, negates petitioner's contention that the loan was needed to solve a "liquidity dilemma".  The loan structure, in effect, constituted an indirect use of Erie stock to pay the debts of Mrs. Black's estate and accomplished nothing more than a direct use of that stock for the same purpose would have accomplished, except for the substantial estate tax savings. Those circumstances distinguish these cases from the cases on which petitioner relies in which loans from a related, family-owned corporation to the estate were found to be necessary to avoid a forced sale of illiquid assets, see Estate of Todd v. Commissioner, 57 T.C. 288 (1971); Estate of Graegin v. Commissioner, T.C. Memo. 1988-477, or to enable the estate to retain the lender's stock for future appreciation, McKee v. Commissioner, T.C. Memo. 1996-362.  In none of those cases was there a sale of either the stock or assets of the lender to pay debts of the estate borrower, as occurred in these cases. Moreover, as respondent points out, the principal beneficiary of the estate, petitioner, was also the majority partner in Black LP.  Thus, he was on both sides of the transaction, in effect paying interest to himself.  As a result, those payments effected no change in his net worth, except for the net tax savings.

Having found that the interest on the purported loan from Black LP to Mrs. Black's estate and the revocable trust was not "necessarily incurred in the administration of the decedent's estate", as required by section 20.2053-3(a), Estate Tax Regs.,

we do not address the issue of whether the transaction resulted in a bona fide loan.

D. Conclusion

The $20,296,274 interest expense incurred by Mrs. Black's estate did not constitute a deductible administration expense under section 2053(a)(2).[21]

VI. The Fee Deductibility Issues

A. Background

Respondent seeks to deny to Mrs. Black's estate a deduction for (1) any portion of the $980,625 the estate paid to Black LP as reimbursement for the latter's reimbursement of Erie for costs incurred in connection with the secondary offering of Black LP's Erie stock,[22] (2) any portion of the $1,155,000 executor fee paid to petitioner in excess of $500,000, and (3) any portion of the $1,155,000 in legal fees paid to MacDonald Illig in excess of $500,000. Mrs. Black's estate deducted each of the foregoing payments on Schedule L, Net Losses During Administration and

---

[21]Because we deny the entire deduction for interest on the ground that the $71 million loan (or, indeed, any loan) from Black LP was unnecessary to enable Mrs. Black's estate to discharge its debts, we have not addressed respondent's alternative argument that the loan was larger than what was needed to discharge the debts of Mrs. Black's estate, and that interest attributable to the loan proceeds used to fund the $20 million bequest to Penn State Erie (an obligation of Mr. Black's estate) should be treated as nondeductible.

[22]Although Mrs. Black's estate and the revocable trust, as coborrowers under the loan agreement, both agreed to reimburse Black LP for its expenses related to the secondary offering, and although petitioner signed that agreement in his dual capacity as executor for the estate and trustee of the trust, respondent does not dispute that the estate made the payment at issue; he disputes only its deductibility by the estate.

Expenses Incurred in Administering Property Not Subject to Claims, as expenses incurred in administering nonprobate property. Petitioner argues that Mrs. Black's estate is entitled to deduct each of those expenditures in its entirety.

B. General Principles

Section 2053(b), entitled "Other administrative expenses", generally provides a deduction for expenses incurred in administering nonprobate property, to the same extent as they would be deductible under section 2053(a); i.e., if incurred in administering probate property.[23] Thus, such expenses must be "actually and necessarily incurred in the administration of the decedent's estate; that is, in the collection of assets, payment of debts, and distribution of property to the persons entitled to it."[24] Sec. 20.2053-3(a), Estate Tax Regs.

---

[23]Because such expenses relate to nonprobate property, they are not subject to the requirement, in sec. 2053(a), that they be "allowable by the laws of the jurisdiction * * * under which the estate is being administered."

[24]The evidence indicates that some portion of each of the fees in question relates to activities that necessarily involve the administration of both probate and nonprobate property. Because the principles governing deductibility are identical for both types of expenditures, the distinction is without consequence herein. Moreover, as in the case of the interest expense incurred by Mrs. Black's estate, to the extent the fees in question relate to probate property, respondent does not argue that Pennsylvania law bars petitioner from claiming the fees as proper administration expenses. See supra note 16.

C.  Analysis and Conclusions

    1.  Reimbursement of Costs Incurred in Connection
       With the Secondary Offering: $982,070

Petitioner argues that the secondary offering of Black LP's Erie stock followed by a loan of a portion of the proceeds was a legitimate means of paying the estate tax liability and the obligations under the revocable trust of Mrs. Black's estate, and that its reimbursement of Erie's expenses related to the secondary offering was a "reasonable and necessary" and, therefore, deductible cost of Mrs. Black's estate.  Respondent argues that the reimbursement was not "necessary" within the meaning of section 20.2053-3(a), Estate Tax Regs., because the Erie stock belonged to Black LP, not Mrs. Black's estate, and that Black LP sold the stock.

To the extent the secondary offering of Erie stock generated funds needed and used to discharge debts of Mrs. Black's estate, Black LP's obligation to reimburse Erie for costs associated with that offering was related to and occasioned by Mrs. Black's death, and, for that reason, the reimbursement might be deductible by her estate under section 2053.  Accord sec. 20.2053-8(d) Example (1), Estate Tax Regs.; see Burrow Trust v. Commissioner, 39 T.C. 1080, 1089 (1963) (holding that, where a revocable inter vivos trust paid its own trustee's fees, the settlor's estate could nonetheless deduct those fees under section 2053 because the trustees' services "were primarily occasioned by the death of the decedent"), affd. 333 F.2d 66 (10th Cir. 1964).  Moreover, the payment at issue is the estate's

reimbursement of Black LP pursuant to the loan agreement, not Black LP's reimbursement of Erie.  Therefore, the payment may qualify as an expense related to a sale "necessary in order to pay the decedent's debts, expenses of administration, or taxes" within the meaning of section 20.2053-3(d)(2), Estate Tax Regs., despite the fact that the property sold was, technically, property owned by Black LP rather than by the estate.  We find that the estate's indirect ownership, through its interest in Black LP, of the Erie stock is sufficient to bring the sale of that stock within the cited regulation, which concerns the deductibility of expenses of selling "property of the estate".

The flaw in petitioner's argument is that only a portion of the funds the secondary offering generated was used on behalf of Mrs. Black's estate.  Of the $98 million realized from Black LP's sale of Erie stock, only $71 million was made available to the estate, and of that $71 million, $20 million was used to fulfill Mr. Black's bequest, through the revocable trust, to Penn State Erie.  That bequest was an obligation of Mr. Black's estate. After subtracting the approximately $3.3 million of fees at issue herein, it appears that approximately $48 million ($31,736,527 for Federal estate taxes,[25] $15,700,000 for Pennsylvania

---

[25]Petitioner argues, in connection with the interest deductibility issue, that the entire $71 million loan was needed to pay the tax liabilities and administrative expenses estimated to be payable by Mrs. Black's estate as of the February 2003 loan date.  Petitioner includes in that computation the $54 million Federal estate tax payment that accompanied the February 2003 Form 4768, Application For Extension of Time to File a Return and/or Pay U.S. Estate (and Generation-Skipping Transfer) Taxes.

(continued...)

inheritance and estate taxes, and $581,349 for Federal and Pennsylvania fiduciary income taxes resulting from capital gain on the sale of Black LP's Erie stock in connection with the secondary offering) or approximately 49 percent of the $98 million the secondary offering raised was actually used to discharge debts of Mrs. Black's estate. Therefore, we find that Mrs. Black's estate is entitled to deduct $481,000 of its $982,070 reimbursement of costs related to the secondary offering.

### 2. Executor's Fee Paid to Petitioner: $1,155,000

Petitioner claims that the executor's fee constituted payment for his services related to raising funds to pay the estate tax, responding to audit requests, marshaling assets of Mrs. Black's estate, and gathering materials and information necessary to prepare the estate tax return for Mrs. Black's estate, including materials and information necessary to enable the appraiser to determine the value of the assets in Mrs. Black's estate. Much of that effort consisted of gathering information and materials for the appraisal of the class B

---

[25](...continued)
There is no explanation in the record for the more than $22 million overpayment (which was refunded to the estate) of Federal estate taxes, but Mr. Cullen's July 29, 2002, letter to Erie soliciting Erie's assistance in raising cash for the estate makes clear that, among the items for which a cash infusion was said to be necessary, was "$50 million to fulfill Mr. and Mrs. Black's charitable bequests", the only such bequest being Mr. Black's $20 million bequest to Penn State Erie via the revocable trust. Therefore, we reject petitioner's attempt to allocate $54 million of the loan proceeds to Federal estate taxes and nothing to the $20 million bequest to Penn State Erie.

limited partnership interest that was to constitute the corpus to the marital trust, and effort associated with the secondary offering. Petitioner argues that all his efforts related to nonprobate property included in Mrs. Black's gross estate and that, therefore, his fee was deductible by the estate under section 2053(b). Respondent argues that $650,000 of petitioner's fee related to services performed for Mr. Black's estate, the revocable trust, and Black LP "for which no deduction is permitted to Mrs. Black's estate."

We find that petitioner's fee, insofar as it related to his efforts in connection with the secondary offering of Erie stock, is deductible to the same extent as is the estate's reimbursement of Erie's costs related to that sale; i.e., to the extent that the funds raised thereby were used to discharge debts of Mrs. Black's estate. Thus, approximately 49 percent of that portion of the fee is deductible.

We find that petitioner's gathering of information for appraisers represented effort on behalf of both Mr. and Mrs. Black's estates. A lengthy appraisal of the date-of-death value of the Black LP interest included in the gross estate of each decedent was attached to the Federal estate tax return filed on behalf of each estate. The two appraisals were conducted by the same appraisal company, appraised the same type of interest (an interest in Black LP), used the identical appraisal methodology, were approximately the same length, and, to a great extent, contained identical language. Therefore, to assume that whatever

information petitioner supplied to the appraiser pertained more or less equally to each appraisal is reasonable. For that reason, we find that the portion of the executor's fee attributable to petitioner's services related to the appraisals should be divided equally between the two estates so that Mrs. Black's estate may deduct only one-half of that amount.

We also find that whatever portion of petitioner's fee that may be said to have compensated him for his services related to the marital trust (services that, allegedly, consumed 90 percent of his time) must be divided equally between the estates. Petitioner's argument for full deductibility of the fee is that "the marital trust has a direct nexus to Mrs. Black's Estate because the estate tax liability for the inclusion of the Marital Trust's assets in the gross estate is borne by Mrs. Black's Estate. See I.R.C. § 2044." But the fee has an equally direct nexus to Mr. Black's estate because his estate may deduct under section 2056 the value on the date of his death of the marital trust's assets. That deduction exactly mirrors the inclusion, by Mrs. Black's estate, of the value of those assets on the date of her death and is of equal significance.

The same is true of whatever portion of the executor's fee may be said to have compensated petitioner for his efforts in responding to respondent's audit requests. Both estates were under audit so that a 50-50 split between the estates also appears to be appropriate in connection with that effort.

Lastly, we agree with respondent that no more than a de minimis portion (e.g., 1 percent) of the executor fee should be allocated to petitioner's marshaling of assets on behalf of Mrs. Black's estate. As respondent states, the estate consisted of assets worth only $39,709 in addition to the Erie stock in the marital trust, which was valued by the estate's own appraiser at over $100 million.

According to the foregoing we find that one-half of the $1,155,000 executor's fee paid to petitioner was attributable to his efforts on behalf of Mrs. Black's estate. Therefore, that estate is entitled to a deduction of $577,500 for the executor's fee.

### 3. Legal Fees Paid to MacDonald Illig: $1,155,000

Mr. Cullen testified that the legal fees related to "[e]verything in connection with the death of Mrs. Black, including the administration of her estate, the [marital] trust, preparation of [estate and fiduciary] tax returns, participation in the secondary [offering], everything." The "everything" also included services (assisting petitioner) in connection with the estate tax audit. Mr. Cullen further testified that 80 percent of his firm's time was spent on matters relating to the marital trust, which included services related to the secondary offering, and 20 percent on matters relating to Mrs. Black's estate, including estate and fiduciary return preparation and payment of the taxes owed.

Respondent argues that Mrs. Black's estate "should be allowed to deduct fees only in the amount of $500,000, and that $650,000 should be disallowed as being related to services rendered to entities other than the marital trust." Thus, respondent does not challenge the overall reasonableness of the fee charged for legal services on behalf of the two estates and the marital trust. He challenges only petitioner's treatment of the entire fee as a charge to Mrs. Black's estate.

For the reasons stated supra, in connection with our consideration of the deductibility of petitioner's fee, we find that Mrs. Black's estate may deduct 49 percent of whatever portion of the legal fees is attributable to services related to the secondary offering and one-half of the portion attributable to services related to the marital trust and the Federal estate tax audit. Similarly, because each estate filed a Federal gift tax and a Federal estate tax return, we find that a 50-50 split of the portion of the legal fees attributable to MacDonald Illig's services in preparing those returns is appropriate.

Only Mrs. Black's estate filed fiduciary income tax returns. Therefore, her estate may deduct the portion of the legal fees attributable to the preparation and filing of those returns. The record does not contain copies of those returns. If, as Mr. Cullen testified, those returns reflected only the capital gain passed through to Mrs. Black's estate on Black LP's sale of Erie stock in connection with the secondary offering, the returns could not have been particularly complex. Thus, the fee

attributable to the preparation of those returns should be relatively small.[26]

As in the case of petitioner's fee, we find that one-half of the $1,155,000 in legal fees was attributable to services rendered to Mrs. Black's estate. Therefore, that estate is entitled to a deduction of $577,500 for legal fees.[27]

To reflect the foregoing,

<u>Decisions will be entered under Rule 155</u>.

---

[26]The record does not contain a copy of the MacDonald Illig bill for services rendered to Mrs. Black's estate. Therefore, we do not know how that firm apportioned its fee to the various services rendered.

[27]No petition filed in these consolidated cases alleges that all or any portion of the executor's fee and/or legal fees disallowed as deductions to Mrs. Black's estate should be allowed as deductions to Mr. Black's estate. Moreover, petitioner has neither amended the pleadings under either Rule 41(a) or (b) nor filed supplemental pleadings under Rule 41(c) to so allege. Therefore, we do not consider the deductibility by Mr. Black's estate of all or any portion of the disallowed amounts.